No. 47,363

Marvin G. Brown, Sr., et al., *Appellants*, v. Wichita State University, et al, *Appellees*. Mike Bruce, et al, *Appellants*, v. Wichita State University, et al, *Appellees*. Hallie Eugenia Robinson, Individually and as the Administratrix of the Estate of Eugene Robinson, et al, *Appellants*, v. Wichita State University, et al, *Appellees*.

(547 P. 2d 1015)

Opinion on rehearing filed March 6, 1976.

(For original opinions see, *Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66, and *Brown v. Wichita State University, P. E. C., Inc.*, 217 Kan. 661, 538 P. 2d 713.)

*John W. Norman, Jr.*, of Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, of Oklahoma City, Oklahoma, argued the cause, and *Ronald D. Heck*, of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, and *David W. Kennedy*, of Greene & Kennedy, of Wichita, were with him on the briefs for the appellants.

*Wayne Coulson*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause and was on the brief for the appellee Wichita State University Physical Education Corporation, Inc.

*Paul B. Swartz*, of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and *J. Taylor Neuschwander*, of the same firm, was with him on the brief for the appellee Wichita State University.

*Curt T. Schneider,* attorney general, and *Philip A. Harley,* assistant attorney general, were on the brief *amici curiae,* for the Attorney General of Kansas.

*Robert A. Coldsnow,* of Topeka, was on the brief *amicus curiae,* for the Kansas Senate, Kansas House of Representatives and Kansas Legislative Coordinating Council.

*Keith Eales,* of Topeka, and *Jerry Richard Palmer,* of Topeka, were on the brief *amici curiae,* for The Kansas Trial Lawyers Association.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, and *Robert N. Partridge,* of the same firm, were on the brief *amici curiae,* for the Kansas Association of Defense Counsel.

*Barkley Clark,* of Lawrence, and *Frank A. Bien,* of Topeka, were on the brief *amici curiae,* for the League of Kansas Municipalities.

The opinion of the court was delivered by

SCHROEDER, J.: Pursuant to post-decision motions to modify and to supplement the decisions in *Brown v. Wichita State University,* 217 Kan. 279, 540 P. 2d 66, and *Brown v. Wichita State University, P. E. C., Inc.,* 217 Kan. 661, 538 P. 2d 713, this court, considering the motions as motions for rehearing, consolidated those matters and granted a rehearing. The order granting a rehearing requested counsel to brief four questions, two of which are pertinent to the court's opinion on rehearing:

"1. Where the court abrogates judicially imposed governmental immunity does the Legislature have the constitutional authority to reimpose governmental immunity?

"2. Assuming the answer to the foregoing question is in the affirmative, does Chapter 200, Laws of 1970, (K. S. A. 46-901 *et seq.*) offend constitutional guarantees in Sections 1, 2 and 18 of the Kansas Bill of Rights, the Fourteenth Amendment to the Constitution of the United States or any other constitutional provisions?"

Pursuant to request the Attorney General of Kansas; the Kansas Legislative Counsel for the Kansas Senate, Kansas House of Representatives and Kansas Legislative Coordinating Council; the Kansas Trial Lawyers Association; the Kansas Association of Defense Counsel; and the League of Kansas Municipalities all filed briefs *amicus curiae* on these questions materially aiding the court in resolving these questions.

The court reaffirms its decision holding that the trial court erroneously granted summary judgment, and it reaffirms the first thirteen syllabi and the corresponding portions of the opinion in *Brown v. Wichita State University,* 217 Kan. 279, 540 P. 2d 66, pertaining to third party beneficiaries, agency relationships and contractual obligations.

After due consideration, however, the portion of the opinion declaring K. S. A. 46-901, *et seq.,* unconstitutional is vacated.

The facts surrounding this controversy are fully reported in the court's previous opinions and need not be expanded.

In view of the legislature's statutory imposition of governmental immunity, the history of governmental immunity is important in three respects. First, the governmental immunity doctrine was judicially created. Second, it was part of the common law at the time the Kansas Constitution was adopted. (See, *Maffei v. Town of Kemmerer,* 80 Wyo. 33, 338 P. 2d 808 [1959].) Third, on March 26, 1970, the Kansas Legislature explicitly enacted a comprehensive governmental immunity statute, K. S. A. 46-901, *et seq.,* (L. 1970, ch. 200, §§ 1-13, March 26).

Prior to March 26, 1970, the governmental immunity doctrine was of judicial origin in Kansas. This was recognized in *Carroll v. Kittle,* 203 Kan. 841, 847, 457 P. 2d 21. There it was said our constitution does not touch on the subject and the legislative enactments were characterized as "a series of sporadic statutes," and not "a comprehensive legislative enactment designed to cover the field." (*Carroll v. Kittle,* supra at 847-848.) In *Carroll* the court further recognized courts throughout the country were widely split on questions of govenmental immunity and the governmental or proprietary character of a state hospital operation. The court there stated:

"After careful consideration a majority of the court is now of the opinion that it is appropriate for this court to abolish governmental immunity for negligence, when the state or its governmental agencies are engaged in proprietary activities, in the absence of the legislature's failure to adopt corrective measures." (p. 848.)

*Carroll,* as indicated by the quotation from *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934, and the dissenting opinions, was based on matters of public policy and *not based on constitutional grounds.*

*Carroll's judicial abolition* of governmental immunity which was judicially, not *statutorily,* created finds support in many other states. It must be recognized that many states have judicially abrogated to varying degrees their judicially created doctrine of governmental immunity. (See, *City of Fairbanks v. Schaible,* 375 P. 2d 201 [Alas. 1962], overruled in part, *Scheele v. City of Anchorage,* 385 P. 2d 582 [Alas. 1963]; *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P. 2d 107 [1963]; *Parish v. Pitts,* 244 Ark. 1239, 429

S. W. 2d 45 [1968]; *Muskopf v. Corning Hospital Dist.*, 55 Cal. 2d 211, 11 Cal. Rptr. 89, 359 P. 2d 457 [1961]; *Evans v. County Comm.*, 174 Colo. 97, 482 P. 2d 968 [1971]; *Hargrove v. Town of Cocoa Beach*, 96 So. 2d 130, 60 A. L. R. 2d 1193 [Fla. 1957]; *Smith v. State*, 93 Idaho 795, 473 P. 2d 937 [1970]; *Molitor v. Kaneland Com. Unit Dist.*, 18 Ill. 2d 11, 163 N. E. 2d 89, 86 A. L. R. 2d 469 [1959], cert. denied, 362 U. S. 968, 4 L. Ed. 2d 900, 80 S. Ct. 955 [1960]; *Campbell; Knotts v. State*, 259 Ind. 55, 284 N. E. 2d 733 [1972]; *Klepinger v. Bd. of Comm. Co. of Miami*, 143 Ind. App. 155, 239 N. E. 2d 160 [1968]; *Haney v. City of Lexington*, 386 S. W. 2d 738, 10 A. L. R. 3d 1362 [Ky. 1964]; *Board of C. of P. of New Orleans v. Splendour S. & E. Co.*, 273 So. 2d 19 [La. 1973]; *Sherbutte v. Marine City*, 374 Mich. 48, 130 N. W. 2d 920 [1964]; *Williams v. City of Detroit*, 364 Mich. 231, 111 N. W. 2d 1 [1961]; *Spanel v. Mounds View School Dist. No. 621*, 264 Minn. 279, 118 N. W. 2d 795 [1962]; *Brown v. City of Omaha*, 183 Neb. 430, 160 N. W. 2d 805 [1968]; *Johnson v. Municipal University of Omaha*, 184 Neb. 512, 169 N. W. 2d 286 [1969]; *Rice v. Clark County*, 79 Nev. 253, 382 P. 2d 605 [1963]; *Merrill v. City of Manchester*, 114 N. H. 722, 332 A. 2d 378 [1974]; *Willis, et al. v. Dept. of Cons. & Ec. Dev.*, 55 N. J. 534, 264 A. 2d 34 [1970]; *Hicks v. State*, 88 N. M. 588, 544 P. 2d 1153; *Kitto v. Minot Park District*, 224 N. W. 2d 795 [N. D. 1974]; *Ayala et al. v. Phila. Bd. of Pub. Educ.*, 453 Pa. 584, 305 A. 2d 877 [1973]; *Becker v. Beaudoin*, 106 R. I. 562, 261 A. 2d 896, reargument denied, 106 R. I. 838, 261 A. 2d 896 [1970]; *Long v. City of Weirton*, 214 S. E. 2d 832 [W. Va. 1975]; *Holytz v. Milwaukee*, 17 Wis. 2d 26, 115 N. W. 2d 618 [1962]; and *Spencer v. General Hospital of District of Columbia*, 425 F. 2d 479, [D. C. Cir. 1969].) In all of the above cases it was common law or judicially created immunity which was abrogated, and not a comprehensive statutory enactment. These cases often dismissed the legislative enactments which they encountered as "sporadic" or "not comprehensive." (*Carroll v. Kittle*, supra at 848; *Muskopf v. Corning Hospital Dist.*, supra at 218; *Brown v. City of Omaha*, supra at 433-434.)

Following *Carroll's* judicial abrogation of judicially created governmental immunity, the Kansas Legislature quickly passed a "comprehensive" enactment reimposing governmental immunity in Kansas. (See, *Woods v. Kansas Turnpike Authority*, 205 Kan. 770, 774, 472 P. 2d 219.) This enactment reads in part:

46-901—

"(a) It is hereby declared and provided that the following shall be immune from liability and suit on an implied contract, or for negligence or any other tort, except as is otherwise specifically provided by statute:

"(1) The state of Kansas; and

"(2) boards, commissions, departments, agencies, bureaus and institutions of the state of Kansas; and

"(3) all committees, assemblies, groups, by whatever designation, authorized by constitution or statute to act on behalf of or for the state of Kansas.

"(b) The immunities established by this section shall apply to all the members of the classes described, whether the same are in existence on the effective date of this act or become members of any such class after the effective date of this act.

"(c) The state of Kansas and all boards, commissions, departments, agencies, bureaus and institutions and all committees, assemblies and groups declared to be immune from liability and suit under the provisions of subsection (a) of this section shall, in all express contracts, written or oral, with members of the public, give notice of such immunity from liability and suit."

46-902—

"(a) Nothing in section 1 [46-901] of this act shall apply to or change the liabilities of local units of government, including (but not limited to) counties, cities, school districts, community junior colleges, library districts, hospital districts, cemetery districts, fire districts, townships, water districts, irrigation districts, drainage districts and sewer districts, and boards, commissions, committees, authorities, departments and agencies of local units of government.

"(b) The provisions of section 1 [46-901] of this act shall not create any liability not now existent according to law, nor effect, change or diminish any procedural requirement necessary for recovery from any local unit of government."

In analyzing K. S. A. 46-901, *et seq.*, the first query on rehearing is:

"Where the court abrogates judicially imposed governmental immunity does the Legislature have the constitutional authority to reimpose governmental immunity?"

The court answers this question in the affirmative, subject to the limitation that an unconstitutional act is of no binding force.

The Kansas Constitution grants all legislative power to the House of Representatives and to the Senate. (Art. 2, § 1.) In *Leek v. Theis*, 217 Kan. 784, 539 P. 2d 304, the court held all governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions. (Syl. ¶ 7.)

Absent violation of constitutional rights, the legislature may control governmental immunity. Our cases prior to *Carroll* have consistently recognized this. (*American Mut. Liability Ins. Co. v.*

*State Highway Comm.,* 146 Kan. 239, 243, 69 P. 2d 1091; *Shields v. State Highway Commission,* 178 Kan. 342, 346, 286 P. 2d 173; *Wendler v. City of Great Bend,* 181 Kan. 753, 769, 316 P. 2d 265; *Caywood v. Board of County Commissioners,* 194 Kan. 419, 423, 399 P. 2d 561; *Parker v. City of Hutchinson,* 196 Kan. 148, 155, 410 P. 2d 347; and *McCoy v. Board of Regents,* 196 Kan. 506, 512, 413 P. 2d 73.)

In *Carroll v. Kittle,* supra, the court in abrogating judicially created immunity stated:

". . . [W]e want it clearly understood that we recognize the authority of the legislature to control the entire field including that part covered by this opinion. . . ." (p. 848.)

The invitation for legislative action in the face of *Carroll's* abolition of judicially created immunity is significant. In 1966, in *Parker v. City of Hutchinson,* supra, the court recognized where other courts had abrogated governmental immunity:

"'. . . [T]he legislatures have hastened to undo the damage done by the courts and have restored immunity entirely or stated the areas of immunity and liability, prescribed limitations on recovery, and otherwise restored the stature of government as government. . . .'" (p. 152.)

The experiences of Illinois, California and Wisconsin were discussed in the *Parker* opinion. (See also, *McCoy v. Board of Regents,* supra at 509.) Thus K. S. A. 46-901, *et seq.,* was not totally unexpected by the court. The court, in effect, requested legislative judgment. It has been given. Regardless of the personal views of members of the court, the legislative policy has been clearly enunciated and should be accepted, unless the legislative policy is found to be unconstitutional.

Our cases following *Carroll,* and the legislative reimposition of governmental immunity, have recognized:

". . . [S]ound judicial policy dictates that further inroads by this tribunal into the immunity doctrine as it relates to liability of the state is neither warranted nor justified. . . ." (*Woods v. Kansas Turnpike Authority,* 205 Kan. 770, 774, 472 P. 2d 219.)

(See also, *Daniels v. Kansas Highway Patrol,* 206 Kan. 710, 713, 482 P. 2d 46; and *Allen v. City of Ogden,* 210 Kan. 136, 138, 499 P. 2d 527.)

In many of the cases upon which the appellants rely the courts, in abrogating judicially created immunity, have recognized the authority of the legislature to reinstate immunity if it deems it to be better public policy. (*Holytz v. Milwaukee,* supra at 40;

*Evans v. County Comm.,* supra at 105; *Smith v. State,* supra at 803; *Williams v. City of Detroit,* supra at 235, 244, 260-261; *Brown v. City of Omaha,* supra at 434; *Merrill v. City of Manchester,* supra at 730, 332 A. 2d at 384; and *Becker v. Beaudoin,* supra at 571.)

Furthermore, in at least nine jurisdictions judicial abrogation of judicially imposed governmental immunity has been followed by at least limited legislative reimposition of immunity. Nothing indicates there was ever any doubt in these jurisdictions that the legislature could occupy the governmental immunity field. (See, Ark. Stat. Ann. §§ 12-2901-03 [Supp. 1975]; Cal. Gov't Code §§ 810-996.6 [West 1966]; Colo. Rev. Stat. Ann. §§ 24-10-101-117 [1973]; Ill. Ann. Stat., ch. 85, § 1-101, *et seq.,* [Smith-Hurd 1966]; Mich. Stat. Ann. § 3.996 [101], *et seq.,* [1969]; Minn. Stat. Ann. §§ 466.01-17 [1973]; Nev. Rev. Stat. §§ 41.031-.039 [1973]; N. J. Stat. Ann. § 59:1-1, *et seq.,* [Supp. 1974]; and Wis. Stat. Ann. § 895.43 [1966].)

In *Leek v. Theis,* supra, the court's view on the separation of powers doctrine was clearly enunciated. The separation of powers doctrine is designed to avoid a dangerous concentration of power, and to allow the respective powers to be assigned to the department best fitted to exercise them. It must be conceded the legislature is better equipped to resolve the difficult policy questions inherent in the field of governmental immunity. As judges our desire to achieve what may seem fair to us as individuals cannot overcome the laws enacted by our duly elected legislators. *Ayala et al. v. Phila. Bd. of Pub. Educ.,* supra at 608, indicates the legislatures of Hawaii, Iowa, New York, Oklahoma, Oregon, Utah and Washington have statutorily abrogated governmental immunity. The Kansas legislature has chosen to statutorily impose governmental immunity. That view, if constitutional, represents the law which the court must apply to this case.

Having concluded the legislature had the power to reimpose governmental immunity, the query becomes:

". . . [D]oes Chapter 200, Laws of 1970, (K. S. A. 46-901 *et seq.*) offend constitutional guarantees in Sections 1, 2 and 18 of the Kansas Bill of Rights, the Fourteenth Amendment to the Constitution of the United States or any other constitutional provisions?"

It is the court's opinion, after carefully reviewing the many decisions cited in the briefs on rehearing, K. S. A. 46-901, *et seq.,* does not offend any constitutional provision.

Long-standing and well established rules of the court are that the constitutionality of a statute is presumed, that all doubts must

be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. (*Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 408 P. 2d 877; *Moore v. Shanahan*, 207 Kan. 645, 651, 486 P. 2d 506; and *Leek v. Theis*, supra at 793.)

With this standard in mind, the court first examines Section 18 of the Kansas Bill of Rights. That section provides:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

The appellants argue our abolition of charitable immunity announced in *Noel v. Menninger Foundation*, supra, and enforced in *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 391 P. 2d 115, as well as our decision in *Sanders v. State Highway Commission*, 211 Kan. 776, 508 P. 2d 981, requires that Section 18 be recognized to abrogate governmental immunity. For the reasons hereafter assigned these cases do not require this result.

Section 18 does not create any new rights, but merely recognizes long established systems of laws existing prior to the adoption of the constitution. (See, 16 Am. Jur. 2d, Constitutional Law, § 385, p. 721.) Since the right to sue the state for torts was a right denied at common law, such right is not protected by Section 18. This conclusion is consistent with our view that the laws at the time the constitution was framed are relevant in interpreting our constitution. (*Leek v. Theis*, supra at 793.) It seems unlikely framers of our constitution intended Section 18 to abrogate governmental immunity. Were this true, our early court decisions would have reached that result. Instead, our prior decisions uphold governmental immunity.

*Noel v. Menninger Foundation*, supra, and *Neely v. St. Francis Hospital & School of Nursing*, supra, are distinguishable because charitable immunity was not a right existing at common law. As the *Noel* case (p. 756) indicates, the United States first adopted charitable immunity in 1876 and Kansas first adopted charitable immunity in 1916. Governmental immunity, however, was part of our common law before the Kansas Constitution was adopted. Thus, it was proper for the court to rule in *Noel* that charitable immunity violated Section 18.

Reference is also made to *Sanders v. State Highway Commission*, supra, a case dealing with inverse condemnation by the state highway commission. The constitutional provision primarily involved there was Article 12, Section 4. That Section provides:

"No right of way shall be appropriated to the use of any corporation, until full compensation therefor be first made in money, or secured by a deposit of money, to the owner, irrespective of any benefit from any improvement proposed by such corporation."

In *Sanders* the court held:

"The appropriation of a landowner's right to the lateral support of his land, while constructing a state highway, is a taking for which our constitution guarantees payment of full compensation." (p. 787.)

The court further recognized inverse condemnation was outside the mantle of immunity provided by K. S. A. 46-901, *et seq.* Thus *Sanders* affords no support for the appellants whose tort claims fall directly within the language of K. S. A. 46-901.

In *Caywood v. Board of County Commissioners*, supra at 423, and in *McCoy v. Board of Regents*, supra at 511-512, both of which were decided after *Noel* and *Neely*, the court held Section 18 and governmental immunity are not irreconcilable. Those decisions are hereby recognized as authoritative and correctly hold Section 18 does not require that governmental immunity be held unconstitutional.

An analogous situation is found in Arkansas whose Supreme Court judicially abrogated the common law of governmental immunity. (*Parish v. Pitts*, supra.) The legislature quickly imposed statutory governmental immunity. (Ark. Stat. Ann. §§ 12-2901-2903.) The Arkansas Supreme Court has accepted the legislative statement of public policy as being "plain and unambiguous" and leaving "no room for doubt." (*Sullivan, Adm'r v. Pulaski County*, 247 Ark. 259, 261, 445 S. W. 2d 94 [1969].) Arkansas has a constitutional provision. (Art. 2, § 13) guaranteeing remedies for injuries which is similar to our Section 18. In the latest Arkansas governmental immunity case, *Hardin v. City of DeValls Bluff*, 256 Ark. 480, 508 S. W. 2d 559 (1974), it was held:

"Where there was no established jural right to recovery from a city in a tort action at the time of the adoption of the Arkansas Constitution, Art. 2, § 13 does not prohibit legislation involved in Act 165 of 1969 [Ark. Stat. Ann. 12-2901, *et seq.*] granting governmental immunity to cities and counties." (Syl. ¶ 4.)

It has been acknowledged that our Kansas Constitution was modeled after that of Ohio. (*Leek v. Theis*, supra at 798.) Their constitution, Art. 1, § 16, has a "due course of law" constitutional provision similar to Section 18 of our constitution. In *Williams v. Columbus*, 33 Ohio St. 2d 75, 294 N. E. 2d 891 (1973), Justice Gray, dissenting, argued that Art. 1, § 16 of the Ohio Constitution meant persons should have relief against the city. But the majority disagreed. (See also, *Nanna v. Village of McArthur*, 44 Ohio App. 2d 22, 335 N. E. 2d 712 [1974].)

In Wisconsin their constitution, Art. 1, § 9, is similar to our Section 18. In *Firemen's Ins. Co. v. Washburn County*, 2 Wis. 2d 214, 85 N. W. 2d 840 (1957), it was held:

"The provision in sec. 9, art. I, Const., that every person is entitled to a certain remedy in the laws for all 'injuries or wrongs' which he may receive in his person, property, or character, must be construed in the light of the common law as it stood at the time of the adoption of the constitution in 1848; immunity of all governmental units from liability for negligence occurring in the performance of a governmental function, such as maintenance of highways, was then well recognized in the common law; hence the application of such common-law rule of governmental immunity does not violate such constitutional provision." (Syl. ¶ 3.)

(See also, *Cords v. State*, 62 Wis. 2d 42, 214 N. W. 2d 405 [1974]; *Hazlett v. Board of Com'rs of Muskogee County*, 168 Okla. 290, 32 P. 2d 940 [1934]; and *Lundbeck v. State, Department of Highways*, 95 Idaho 549, 511 P. 2d 1325 [1973].)

In our opinion the view expressed in these states is persuasive.

Judicial foresight requires that Section 18 not be invoked to invalidate *every* statutory or judicial limitation on remedies. Section 18 has been held to refer to remedies in the courts. Yet in *Shade v. Cement Co.*, 93 Kan. 257, 144 Pac. 249, it was held a workmen's compensation act does not violate Section 18. In *Fisher v. Toler*, 194 Kan. 701, 401 P. 2d 1012, it was held that despite Section 18 neither spouse may maintain an action in tort for damages against the other. The interpretation given Section 18 by the appellants would endanger these decisions.

A broad application of Section 18 would jeopardize retention of governmental immunity even for governmental functions. Nearly every state in the union recognizes a need for governmental immunity in functions characterized as "governmental." Section 18 does not require the court to hold K. S. A. 46-901, *et seq.*, unconstitutional.

The court next examines the equal protection clause of the Fourteenth Amendment to the United States Constitution which finds its counterpart in Sections 1 and 2 of the Kansas Bill of Rights. (*Manzanares v. Bell,* 214 Kan. 589, 522 P. 2d 1291.)

In *Tri-State Hotel Co. v. Londerholm,* supra, Chief Justice Fatzer set forth clearly and concisely the rules which govern the constitutionality of legislative enactments. There it was stated:

"This court is by the Constitution not made the critic of the legislature, but rather, the guardian of the Constitution; and every legislative act comes before this court surrounded with the presumption of constitutionality. That presumption continues until the Act under review clearly appears to contravene some provision of the Constitution. All doubts of invalidity must be resolved in favor of the law. It is not in our province to weigh the desirability of social or economic policy underlying the statute or to question its wisdom; those are purely legislative matters. . . ." (p. 760.)

This is particularly true with regard to the Fourteenth Amendment equal protection clause. In social and economic legislation, a statutory classification does not violate the equal protection clause merely because its classifications are imperfect. (See, *Village of Belle Terre v. Boraas,* 416 U. S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536; *San Antonio School District v. Rodriguez,* 411 U. S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278, reh. denied, 411 U. S. 959, 36 L. Ed. 2d 418, 93 S. Ct. 1919; and *Jefferson v. Hackney,* 406 U. S. 535, 32 L. Ed. 2d 285, 92 S. Ct. 1724, reh. denied, 409 U. S. 898, 34 L. Ed. 2d 156, 93 S. Ct. 178.) Nor does the equal protection clause require a state "to choose between attacking every aspect of a problem or not attacking the problem at all." (*Dandridge v. Williams,* 397 U. S. 471, 487, 25 L. Ed. 2d 491, 90 S. Ct. 1153, reh. denied, 398 U. S. 914, 26 L. Ed. 2d 80, 90 S. Ct. 1684; and *San Antonio School District v. Rodriguez,* supra at 42.) The foregoing principle was well stated in *West Coast Hotel Co. v. Parrish,* 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578:

". . . This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. . . ." (p. 400.)

(See also, *Williamson v. Lee Optical Co.,* 348 U. S. 483, 99 L. Ed. 563, 75 S. Ct. 461, reh. denied, 349 U. S. 925, 99 L. Ed. 1256, 75

S. Ct. 657; *San Antonio School District v. Rodriguez,* supra at 42; and *Manzanares v. Bell,* supra at 609.)

The appellants contend K. S. A. 46-901, *et seq.,* denies equal protection by discriminating between the various levels of governmental tort-feasors by imposing liability based on the *unit* of government involved. But withholding a legal remedy for persons injured by the state, while allowing a remedy for a non-governmental tortious activity, or a municipal government's tortious activity, is not discriminatory governmental action. (*Krause v. State,* 31 Ohio St. 2d 132, 145, 285 N. E. 2d 736 [1972], appeal dismissed for want of a substantial federal question, 409 U. S. 1052, 34 L. Ed. 2d 506, 93 S. Ct. 557, reh. denied, 410 U. S. 918, 35 L. Ed. 2d 280, 93 S. Ct. 959; *Hutchinson v. Board of Trustees of Univ. of Ala.,* 288 Ala. 20, 25, 256 So. 2d 281 [1971]; and *O'Dell v. School District of Independence,* 521 S. W. 2d 403, 409 [Mo. 1975].) The constitution does not require things which are different in fact or opinion to be treated in law as though they were the same. (*Tigner v. Texas,* 310 U. S. 141, 147, 84 L. Ed. 1124, 60 S. Ct. 879, reh. denied, 310 U. S. 659, 84 L. Ed. 1422, 60 S. Ct. 1092.) The Fourteenth Amendment does not deny to states the power to treat different classes of persons in different ways. (*Reed v. Reed,* 404 U. S. 71, 75, 30 L. Ed. 2d 225, 92 S. Ct. 251.)

Many states hold governmental immunity does not violate the equal protection clause of the Fourteenth Amendment. In states which have refused to judicially abrogate common law immunity, equal protection arguments have failed. (*Crowder v. Department of State Parks,* 228 Ga. 436, 185 S. E. 2d 908 [1971], appeal dismissed for want of a substantial question, 406 U. S. 914, 32 L. Ed. 2d 113, 92 S. Ct. 1768 [1972]; *Azizi v. Board of Regents,* 132 Ga. App. 384, 208 S. E. 2d 153 [1974], aff'd 233 Ga. 487, 212 S. E. 2d 627 [1975]; *O'Dell v. School District of Independence,* supra; and *Swafford v. City of Garland,* 491 S. W. 2d 175 [Tex. Civ. App. 1973].) States whose constitution requires legislative action to abrogate governmental immunity have held governmental immunity does not violate the equal protection clause of the Fourteenth Amendment. (*Krause v. State,* supra; and *Hutchinson v. Board of Trustees of Univ. of Ala.,* supra.)

The appellants direct our attention to New Hampshire, Michigan, Pennsylvania and Wisconsin where the courts judicially abrogated varying degrees of governmental immunity. Yet in those states immunity for the state government is retained, a classification based

solely on the unit of government involved. In none of these states have equal protection arguments succeeded. (*Sousa v. State*, 115 N. H. 340, 341 A. 2d 282 [1975]; *Kriger v. Mutual Aid Pact*, 49 Mich. App. 7, 211 N. W. 2d 228 [1973]; *Knapp v. Dearborn*, 60 Mich. App. 18, 230 N. W. 2d 293 [1975]; *Hall v. Powers and Commonwealth*, 6 Pa. Cmwlth. 544, 296 A. 2d 535 [1972], aff'd 455 Pa. 645, 311 A. 2d 612 [1973]; *Forseth v. Sweet*, 38 Wis. 2d 676, 158 N. W. 2d 370 [1968]; and *Cords v. State*, supra.)

In *Kriger v. Mutual Aid Pact*, supra, the court said:

". . . Withholding legal remedy from persons injured by the state, while granting one to persons injured by nongovernmental tort-feasors does not offend the equal protection clause. . . ." (p. 11.)

In *Sousa v. State*, supra, the court stated:

". . . Nor does it [immunity for the state but not local governmental units] constitute a violation of plaintiffs' rights to equal protection as all those who are similarly situated are similarly treated. . . ." (341 A. 2d at 285.)

The United States Supreme Court has held sovereign immunity constitutional. In the early history of this nation it was said in *Beers v. State of Arkansas*, 61 U. S. 527, 15 L. Ed. 991:

"It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts . . . without its consent and permission. . . ." (p. 529.)

In *Palmer v. Ohio*, 248 U. S. 32, 63 L. Ed. 108, 39 S. Ct. 16, involving a property damage claim against the State of Ohio, the court said:

"The right of individuals to sue a State, in either a federal or a state court, *cannot be derived from the Constitution or laws of the United States.* It can come only from the consent of the State. [Citations omitted.] Whether Ohio gave the required consent . . . is a question of local state law, as to which the decision of the State Supreme Court is controlling with this court, *no federal right being involved.* . . ." (Emphasis added.) (p. 34.)

The passage of time has not diminished the impact of *Palmer.* In *Parden v. Terminal R. Co.*, 377 U. S. 184, 12 L. Ed. 2d 233, 84 S. Ct. 1207, reh. denied, 377 U. S. 1010, 12 L. Ed. 2d 1057, 84 S. Ct. 1903, the United States Supreme Court allowed suit against Alabama on the ground that Alabama consented by entering into activities within the scope of federal legislation. But the Court was careful to distinguish that case from *Palmer* where consent was not found. (See also, *Harris v. Pennsylvania Turnpike Commission*, 410 F. 2d 1332 [3rd Cir. 1969], cert. denied, 396 U. S. 1005, 24 L. Ed. 2d 497, 90 S. Ct. 558.)

If K. S. A. 46-901, *et seq.*, does create a discriminatory classification, that classification is reasonable and thus not violative of the equal protection clause. In the absence of a suspect classification or a violation of a fundamental right, a statutory discrimination should not be set aside if *any state of facts reasonably may be conceived to justify it.* (*McGowan v. Maryland,* 366 U. S. 420, 426, 6 L. Ed. 2d 393, 81 S. Ct. 1101; and *Tri-State Hotel Co. v. Londerholm,* supra at 760-761.)

The United States Supreme Court states in *Ferguson v. Skrupa,* 372 U. S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A. L. R. 2d 1347:

". . . Statutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution. . . ." (p. 732.)

Obviously there are arguments on both sides of the governmental immunity issue. But it is only necessary to reasonably conceive a state of facts to support governmental immunity to uphold the legislative classification set out in K. S. A. 46-901, *et seq.* Three interests support the legislative classification.

First, is the necessity to protect the state treasury. While a state can better afford to pay judgments than a city, and while the experience of states which have abrogated sovereign immunity indicates they have not gone bankrupt, the financial considerations are still relevant. The Missouri Supreme Court, which has consistently held the issue of governmental immunity is for the legislature, said in *Payne v. County of Jackson,* 484 S. W. 2d 483 [Mo. 1972]:

". . . [W]holesale abrogation of the sovereign immunity doctrine could very well deplete the governmental treasury to a point where proper performance of governmental duties would be impaired. . . ." (p. 486.)

Second, governmental immunity enables government to function unhampered by the threat of time and energy consuming legal actions, which would inhibit the administration of traditional state activities. This serves to aid long-range state planning. Knowledge of the unlimited nature of the state's resources might encourage suits which would otherwise never be brought. Certainly to judicially abrogate legislatively imposed governmental immunity complicates this problem. The Missouri Supreme Court in *Payne v. County of Jackson,* supra, referred to the Indiana experience:

". . . Following *Perkins v. Indiana,* 252 Ind. 549, 251 N. E. 2d 30 (1969), which did not eliminate the doctrine entirely but authorized recovery against the state for negligence arising from a *non-governmental function,*

the Indiana Attorney General's Office reported (as of April 16, 1971): 'Since the *Perkins* decision, approximately 85 cases have been filed against the State, and the rate is steadily increasing, the State cannot settle these claims; the State cannot hire local counsel to assist in their defense; the State has no procedural mechanism equipped to handle the heavy case load, and perhaps most significant, in the face of millions of dollars worth of suits pending and several large judgments, the state has no money appropriated with which to pay these judgments so that successful plaintiffs may not be able to get execution of their judgments in view of the restrictions in Art. IV, Sec. 24 of the constitution that "no special act making compensation to any person claiming damages against the state shall ever be passed." ' " (pp. 486, 487.)

The hazards of incomplete "judicial legislation" as mentioned in *Payne* is apropos in Kansas. Under Art. 2, § 24 of our constitution the legislature must make the appropriations for tort claims.

Third, governmental immunity affords that degree of protection demanded by the numerous administrative and high-risk activities undertaken by the various governments. Public agencies engage in activities of a scope and variety far beyond that of any known private business. (Kennedy & Lynch, *Some Problems of a Sovereign Without Immunity*, 36 S. Cal. L. Rev. 161, 177 [1963].) Activities need only be commercial to be classified as proprietary. (*Wendler v. City of Great Bend*, 181 Kan. 753, 316 P. 2d 265.) Thus an activity which is financially unprofitable may be provided as a service, or for some other reason, by a governmental unit, but it would not be provided at reasonable cost, if at all, by private enterprise. The appellants would make such commercial activity, regardless of nature, subject to liability. (See, *Brown v. City of Omaha*, 183 Neb. 430, 160 N. W. 2d 805 [1968] [J. Newton, dissenting].)

Many governmental activities are of a nature so inherently dangerous that no private industry would wish to undertake the risk of administering them. These activities are so important to the health, safety and welfare of the public that they could not possibly be abandoned, although the imposition of broad tort liability upon the agencies engaging in these activities might become extremely burdensome to the taxpayers. (Kennedy & Lynch, *Some Problems of a Sovereign Without Immunity*, supra.)

The appellants contend these arguments also would apply to municipalities. In *Sousa v. State*, supra, the New Hampshire Supreme Court answered the argument as follows:

". . . [S]tate immunity for torts involves certain factors not present in the immunity of cities and towns. By its magnitude the striking of a balance between granting relief to injured claimants and protecting the solvency of the State is a more complex problem at that level than it is for

most cities and towns. Extremely broad considerations of public policy and governmental administration are involved. . . ." (341 A. 2d at 285-286.)

The appellants argue our language in *Carroll v. Kittle,* supra, compels this court to find that equal protection is violated. There the court stated:

"We are forced to conclude that the rule of governmental immunity from liability for torts committed while engaged in proprietary functions is today without *rational* basis and hence there is no logical compulsion to extend it. . . ." (Emphasis added.) (p. 850.)

The foregoing statement in isolation is misleading. This court has frequently said that a statement of law in a given case must be tempered by the facts which give rise to its pronouncement. In *Carroll* the court was faced with judicial abrogation of a judicially created immunity on grounds of public policy, not constitutional law. *Carroll* cannot be stretched to hold that no reasonable set of facts may be conceived to uphold the clear and explicit legislative enactment.

The greatest objection to the equal protection argument lies in the fact that the most ardent advocates of abolition of governmental immunity recognize the need to retain some degree of tort immunity. Yet this need to retain some degree of tort immunity in governmental activities forces an attempt to distinguish the indistinguishable under the equal protection clause. For example, the appellants argue equal protection is violated when liability is determined by the *unit* of government involved. They would prefer to have liability based on the *function* of the governmental tort-feasor.

It must be recognized an injured party has no power to select the tort-feasor causing his injury. If the appellants' distinction is valid, the injury could be occasioned by the activity of a governmental unit whose functions are purely governmental in character and for which no liability would attach, or it could be occasioned by the activity of a governmental unit whose functions are strictly proprietary in character and for which liability would attach. On this argument the appellants assert the legislative classification determined by the unit of government involved creates a distinction which rises to constitutional magnitude.

Regardless of the classification scheme used by the courts or by the legislatures, if some immunity is retained certain persons injured by the government will recover, while others injured, to an equal or greater degree, will not recover. This allegedly discriminatory situation will occur whether the governmental immunity

is based on the "governmental-proprietary" distinction, the "discretionary-nondiscretionary" distinction, or an "open-ended" or a "close-ended" statute.

Many of the Tort Claims Acts which are cited by the appellants as examples of constitutional legislation contain limits on recovery. (See, e. g., Wis. Stat. Ann. § 895.43, and Colo. Rev. Stat. Ann. § 24-10-101, *et seq.*) Yet if a state may within the framework of the equal protection clause limit the amount of recovery against the government, why can it not defeat recovery altogether?

The arguments advanced establish that some classification scheme is necessary, and that any classification scheme adopted is a policy decision. If the court declares the policy judgment made by the legislature in K. S. A. 46-901, *et seq.*, unconstitutional, then any classification scheme which retains any governmental immunity is unconstitutional.

There are no cases which hold governmental immunity invalid based on the equal protection clause of the Fourteenth Amendment. One case cited by the appellants seems to support their position. In *Molitor v. Kaneland Com. Unit Dist.*, 18 Ill. 2d 11, 163 N. E. 2d 89, 86 A. L. R. 2d 469 (1959), cert. denied, 362 U. S. 968, 4 L. Ed. 2d 900, 80 S. Ct. 955 (1960), the Illinois Supreme Court abrogated governmental immunity for local governmental units. (In Illinois the sovereign immunity of the state had a constitutional basis. Section 26 of Article IV of the 1870 Illinois Constitution [repealed 1970] provided that "the state of Illinois shall never be made defendant in any court of law or equity.") The legislature reacted by enacting Ill. Rev. Stat. 1963, ch. 105, par. 12.1-1. In *Harvey v. Clyde Park Dist.*, 32 Ill. 2d 60, 203 N. E. 2d 573 (1965), the Illinois Supreme Court held legislative classification granting complete immunity to some, partial immunity to others and no immunity to others, based upon a variety of factors, violated Section 22 of Article IV of the 1870 Illinois Constitution, which forbade the granting of "any special or exclusive privilege. immunity or franchise" to any corporation, association or individual.

A careful analysis of the *Harvey* case indicates it to be distinguishable on a factual basis as well as a constitutional basis. There the court paraphrased the numerous statutes enacted by the Illinois General Assembly relating to *municipal tort liability* as follows:

"The legislation thus adopted established the following pattern: Forest preserves, park districts and the Chicago Park District are not liable for negligence. (Ill. Rev. Stat. 1963, chap. 57½, par. 3a, chap. 105, pars. 12.1-1,333.2a.)

There is no general provision granting immunity to municipalities—cities, villages and incorporated towns. The substance of earlier provisions relating to liability in specific situations has, however, been retained. Municipalities are liable for injuries caused by the negligent operation of motor vehicles by firemen and volunteer firemen. Municipalities having a population in excess of 500,000 must completely indemnify policemen for their nonwilful torts; other municipalities must indemnify them to the extent of $50,000. Municipalities are liable for damage to property caused by the removal, destruction or vacation of a building as unsafe or unsanitary under certain circumstances. In specified cases municipalities having a population in excess of 5,000 are liable for damage occasioned by mob violence. (Ill. Rev. Stat. 1963, chap. 24, pars. 1-4-1 to 1-4-8.) The negligent tort liability of private schools and of school districts generally is limited to $10,000. (Ill. Rev. Stat. 1963, chap. 122, pars. 821-31.) The Board of Education of the City of Chicago, however, is required to insure its employees, thus apparently permitting unlimited recovery. (Ill. Rev. Stat. 1963, chap. 122, par. 34-18.1.) Counties are not liable for negligence; however, they must indemnify sheriffs and deputy sheriffs to the extent of $50,000, for losses occasioned by nonwilful torts. (Ill. Rev. Stat. 1963, chap. 34, par. 301.1.) The liability of county superintendants of highways is limited to $10,000. (Ill. Rev. Stat. 1963, chap. 121, pars. 381-87.) But township and district highway commissioners are fully liable for neglect of duty. (Ill. Rev. Stat. 1963, chap. 121, par. 6-402.) Drainage districts are liable for negligent torts, but the district commissioners are absolved of personal liability. (Ill. Rev. Stat. 1963, chap. 42, par. 4-40.) Counties, township and district highway commissioners, school districts, and townships are authorized to purchase liability insurance for their agents, employees and officers. (Ill. Rev. Stat. 1963, chap. 34, par. 429.7; chap. 121, par. 6-412.1; chap. 122, pars. 10-21.6, 10-22.3, 29-9; chap. 139, par. 39.24.) These governmental units are thus apparently given unrestricted freedom to determine for themselves whether or not they will be liable for their own negligence." (pp. 62-63.)

The constitutional provisions in Kansas differ materially from those in Illinois and many other states. The Kansas Bill of Rights, Section 2, on privileges reads:

". . . No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

It has consistently been held in Kansas Section 2 relates to political privileges, not property interests. (*Johnson v. Reno County Comm'rs*, 147 Kan. 211, 225, 75 P. 2d 849; and *State, ex rel., v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 439, 296 P. 2d 656.) Our constitution seemingly contemplates that special privileges may be granted under certain circumstances which the legislature may control. (See, *Goodrich v. Mitchell*, 68 Kan. 765, 769, 770, 75 Pac. 1034 [Veteran's Preference Law upheld].)

On the facts and the constitutional provisions underlying *Harvey,* which held the Illinois legislative enactment declaring a park district immune from tort liability unconstitutional, a basis for its application to the comprehensive Kansas legislative enactment here under consideration is lacking.

Last the appellants argue constitutional due process is violated by K. S. A. 46-901, *et seq.* For constitutional due process to be violated, the legislation before this court must bear no reasonable relation to a permissive legislative objective. (*Manzanares v. Bell,* supra; and *City of Colby v. Hurtt,* 212 Kan. 113, 509 P. 2d 1142.) Obviously, retaining some immunity is a permissive legislative objective. Even the appellants argue "it is not a tort to govern."

Judicial history provides some insight. There was a time when the courts used the Fourteenth Amendment due process clause to strike down laws thought to be unwise. (See, *Lochner v. New York,* 198 U. S. 45, 49 L. Ed. 937, 25 S. Ct. 539.) Since then courts have returned to the original concept of constitutional interpretation, that courts do not substitute their social and economic beliefs for the judgment of legislative bodies whose function it is to pass the laws. (*Ferguson v. Skrupa,* 372 U. S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A. L. R. 2d 1347; and *Manzanares v. Bell,* supra.)

The court has been cited to no case where constitutional due process has been used as a basis for the abrogation of legislatively imposed governmental immunity. Neither *Muskopf v. Corning Hospital Dist.,* 55 Cal. 2d 211, 11 Cal. Rptr. 89, 359 P. 2d 457 (1961); *Carroll v. Kittle,* supra; nor *Martin v. State Highway Commission,* 213 Kan. 877, 518 P. 2d 437, deal with constitutional due process in the context of governmental immunity.

The court is here presented with a clear and comprehensive legislative enactment on the subject of governmental immunity in K. S. A. 46-901, *et seq.* Recognizing our past pronouncements on the legislative prerogative, it would be unwise and an untenable judicial encroachment upon a matter within the legislative domain for this court to declare K. S. A. 46-901, *et seq.,* unconstitutional on any ground.

Counsel for the appellees in case No. 47,706 assert on rehearing the failure of this court to deal with the Coleman claim. The appellees' motion for summary judgment recites this claim is for the wrongful death of Ray Coleman. The claimants are Willa Hall, Ruth Richardson and Vada White. Interrogatories were served seeking the relationship of these claimants to the decedent. The

motion further recites Vada White did not answer the interrogatories and her claim was dismissed by the trial court. Willa Hall and Ruth Richardson answered that they were respectively full sister and half sister of the decedent, and that they were not dependent upon the decedent.

Upon this premise the appellees argue that under Kansas law substantive rights flowing from wrongful death are determined by the law of the state where the injury and death occurred (citing *McDaniel v. Sinn*, 194 Kan. 625, 400 P. 2d 1018); and under Colorado law (the place where the accident occurred) sisters of a decedent cannot maintain an action for the wrongful death of a brother (citing *Blom v. United Air Lines*, 152 Colo. 486, 382 P. 2d 993 [1963] and cases cited therein).

While the foregoing recitals are set forth in the appellees' motion for summary judgment, the trial court in sustaining the motion *stated no reasons*. Presumably the motion was sustained for the reasons stated by the trial court in the companion case of *Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66. (See, *Brown v. Wichita State University, P. E. C., Inc.*, 217 Kan. 661, 664, 538 P. 2d 713.)

Our reversal of the trial court for the reasons stated in these cases, consolidated on rehearing, recognizes the viability of the wrongful death action by the claimants in the Coleman matter. We cannot accept the appellees' position, that the trial court must be affirmed as to these claims because the claimants have advanced no theory in opposition to the appellees' motion.

Assuming the facts recited are true, the mere citation of two cases by the appellees on an important conflict of laws question is insufficient briefing for this court to resolve the issue stated. The determination of this question may ultimately affect the disposition of many claims asserted in these cases. We leave this question open. Our recital of the appellees' contention should not be construed as a determination of the issue one way or the other.

The claimants in the Coleman matter are entitled to pursue their cause of action in the trial court until an authoritative determination is made on the basis of the issues presented in the trial court.

In remanding to the district court our original opinion in *Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66, as modified on rehearing this date, controls the disposition of the tort claims in the cases herein consolidated for rehearing. (*Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66 and *Brown v. Wichita*

*State University, P. E. C., Inc.*, 217 Kan. 661, 538 P. 2d 713.) In other words, the constitutional validity of K. S. A. 46-901, *et seq.*, which grants governmental immunity to agencies of the state as set forth in the legislative enactment, must be recognized. Factual issues remain to be determined at the trial level on viable issues sounding in contract.

For the reasons stated in the first thirteen syllabi and the corresponding portions of the opinion in *Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66, the judgment of the trial court, granting the appellees' motion for summary judgment, is reversed.

FATZER, C. J., concurring and dissenting: As this nation commemorates its 200th year of freedom from a tyrannical monarch, the court today replaces the despotic mantle of "the King can do no wrong" on the shoulders of our state government. By the partial affirmance of *Brown v. Wichita State University*, 217 Kan. 279, 540 P. 2d 66, the court validates the constitutionality of an irrational statutory scheme which causes serious inequality for persons in Kansas. The decision of the majority on rehearing renders the doctrine of governmental immunity no less anachronistic; it merely decides the Legislature has constitutionally reimposed this ancient creature of inequity. I must respectfully dissent.

To put the challenged statute, K. S. A. 46-901 *et seq.*, into proper perspective, it is necessary to review the evolution of governmental immunity from tort liability in Kansas. The doctrine is of judicial origin, having first been recognized by this court in *Eikenberry v. Township of Bazaar*, 22 Kan. 389 [* 556], 31 Am. Rep. 198 (1879). As originally applied, it conferred absolute immunity from liability for tortious conduct on all governmental entities absent their consent to suit.

From this beginning, the court gradually limited the doctrine's application to temper its harshness. Cities were made liable for injuries caused by street defects (*see, e. g., Grantham v. City of Topeka*, 196 Kan. 393, 411 P. 2d 634; *City of Topeka v. Tuttle*, 5 Kan. 186 [*311]) and for creating and maintaining a nuisance. (*E. g., Adams v. City of Arkansas City*, 188 Kan. 391, 362 P. 2d 829.) School districts were also liable for activities constituting a nuisance. (*Neiman v. Common School District*, 171 Kan. 237, 232 P. 2d 422.) The most significant limitation on governmental immunity as applied to cities imposed liability for activities of a "proprietary" nature. (*See, e. g., Grover v. City of Manhattan*, 198

Kan. 307, 424 P. 2d 256; *Hinze v. City of Iola*, 92 Kan. 779, 142 Pac. 947.) By contrast, townships, counties, the state and its agencies were clothed with absolute immunity regardless of the function involved. (*See, McCoy v. Board of Regents*, 196 Kan. 506, 413 P. 2d 73; *Caywood v. Board of County Commissioners*, 194 Kan. 419, 399 P. 2d 561; *Eikenberry v. Township of Bazaar*, supra.)

In 1969, before the court rendered its decision in *Carroll v. Kittle*, 203 Kan. 841, 457 P. 2d 21, different rules applied to different units of government, totally independent of the function involved. *Carroll* found this anomaly in the application of the governmental immunity doctrine indefensible and corrected it. *Carroll* extended the "proprietary" limitation on immunity, previously applied only to cities, to *all* levels of government thereby applying governmental immunity uniformly to all governmental entities and equalizing responsibility for tortious acts no matter what unit of government was involved.

The statute under attack in the instant case is the legislative response to *Carroll*.

I cannot accept the majority's characterization of K. S. A. 46-901 *et seq.*, as a "comprehensive" statute. Only in the sense that it touches every level of government is it comprehensive. It is certainly not comprehensive in the sense of being a reasoned legislative application of governmental immunity in Kansas. The statute is an abrupt legislative reaction that perpetuates and reimposes the irrational classifications recognized and corrected in *Carroll*. Absolute immunity is reinstated for the state and its agencies, unless excepted by other statutes (K. S. A. 46-901); liability of all other governmental entities is to be determined under the rule of *Carroll* (K. S. A. 46-902). By enacting K. S. A. 46-901 *et seq.*, the Legislature, for the first time, sanctioned the application of governmental immunity based on the nature of the governmental unit involved. Once again, redress for one tortiously harmed by government depends entirely on the identity of the tort-feasor.

The first question considered by the court on rehearing was:

"Where the court abrogates judicially imposed governmental immunity does the Legislature have the constitutional authority to reimpose governmental immunity?"

The majority answers this question in the affirmative "subject to the limitation that an unconstitutional act is of no binding force." I concur with that portion of the opinion. Our decisions clearly reflect the view that the Legislature may control governmental

immunity short of violating constitutional rights. (*See, Carroll v. Kittle,* supra; *McCoy v. Board of Regents,* supra; *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P. 2d 265; *American Mut. Liability Ins. Co. v. State Highway Comm.,* 146 Kan. 239, 69 P. 2d 1091.) But any act of the Legislature *either imposing or waiving* governmental immunity may be put to the constitutional test. *See, Cashin v. State Highway Comm.,* 137 Kan. 744, 22 P. 2d 939.

This limitation on the Legislature's constitutional authority to act is the very essence of the judiciary's role among the coordinate branches of government. As the guardian of the Constitution, it is the court's duty and final responsibility to decide the constitutional validity of the acts of the Legislature. It is axiomatic that an act of the Legislature purporting to impose or waive governmental immunity in this state is subject to the limitation contained in the state and federal Constitutions. Where such act exceeds the bounds of authority vested in the Legislature and violates constitutional limitations, it is null and void, and it is the clear duty of the courts to so declare. In this sphere of responsibility, courts have no power to overturn laws enacted by the Legislature within constitutional limitations, even though the laws may be unwise, unpolitic and unjust. The remedy in such case lies with the people. But when the legislative action transcends a sacred right guaranteed a person by the state or federal Constitution, final decision on the validity of such action must rest exclusively with the courts. (*Tri-State Hotel Co. v. Londerholm,* 195 Kan. 748, 760, 408 P. 2d 877, 887-88; *Harris v. Shanahan,* 192 Kan. 183, 206-07, 387 P. 2d 771, 790-91.)

I now turn to the second question submitted on rehearing:

". . . [D]oes Chapter 200, Laws of 1970, (K. S. A. 46-901 *et seq*) offend constitutional guarantees in Sections 1, 2 and 18 of the Kansas Bill of Rights, the Fourteenth Amendment to the Constitution of the United States or any other constitutional provisions?"

In exercising its responsibility to rule on the constitutional validity of a legislative act, this court in *Brown v. Wichita State University,* supra, held K. S. A. 46-901 *et seq.,* violated constitutional guarantees in Sections 1, 2 and 18 of the Kansas Bill of Rights and the Fourteenth Amendment to the United States Constitution. On rehearing, a majority of the court now holds the statute offends none of these constitutional provisions.

I am in accord with the statement of rules set forth in the majority opinion to the effect that the constitutionality of a statute

is presumed, that all doubts are resolved in favor of its validity and that before a statute may be stricken down, it must clearly appear it violates the Constitution. Further, it is the court's duty to uphold a statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe it as constitutionally valid, that should be done. *Leek v. Theis,* 217 Kan. 784, 539 P. 2d 304; *Tri-State Hotel Co. v. Londerholm,* supra.

After due consideration, I have been persuaded on rehearing that the correct application of Section 18 of the Kansas Bill of Rights is that expressed by the majority opinion; therefore, I concur with that portion of the opinion. However, I cannot abide the majority's ruling that K. S. A. 46-901 *et seq.,* does not violate Sections 1 and 2 of the Kansas Bill of Rights and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. I dissent from that portion of the majority opinion.

It should first be made clear that the *doctrine* of governmental immunity per se is not here under attack. The majority cites several cases which have upheld the doctrine of governmental immunity, existing either at common law or by provision of a state's Constitution, against equal protection challenges. (*Hutchinson v. Board of Trustees of Univ. of Ala.,* 288 Ala. 20, 256 So. 2d 281 [1971]; *Crowder v. Department of State Parks,* 228 Ga. 436, 185 S. E. 2d 908 [1971], appeal dismissed for want of jurisdiction, 406 U. S. 914, 32 L. Ed. 2d 113, 92 S. Ct. 1768 [1972]; *O'Dell v. School District of Independence,* 521 S. W. 2d 403 [Mo. 1975]; *Sousa v. State,* 115 N. H. 340, 341 A. 2d 282 [1975]; *Krause v. State,* 31 Ohio St. 2d 132, 285 N. E. 2d 736 [1972], appeal dismissed for want of a substantial federal question, 409 U. S. 1052, 34 L. Ed. 2d 506, 93 S. Ct. 557, rehearing denied, 410 U. S. 918, 35 L. Ed. 2d 280, 93 S. Ct. 959 [1973]; *Hall v. Powers and Commonwealth,* 6 Pa. Cmwlth. 544, 296 A. 2d 535 [1972], aff'd 455 Pa. 645, 311 A. 2d 612 [1973]; *Swafford v. City of Garland,* 491 S. W. 2d 175 [Tex. Civ. App. 1973]; *Cords v. State,* 62 Wis. 2d 42. 214 N. W. 2d 405 [1974]; *Forseth v. Sweet,* 38 Wis. 2d 676, 158 N. W. 2d 370 [1968].) The wisdom of these decisions need not concern us here. In *Brown v. Wichita State University,* supra, we did not hold the doctrine of governmental immunity per se violated equal protection guarantees. Rather, we held the *statutory application* of the doctrine was constitutionally impermissible.

Cases upholding the *doctrine* of governmental immunity per se

against equal protection challenges are distinguishable from the instant challenge to a statutory application of the doctrine. It does not follow that because a state may validly choose to maintain or waive its governmental immunity, any statutory classification scheme, no matter how arbitrary or irrational, may be imposed in the process. When the state chooses to create statutory classifications allowing redress for some governmental wrongs and denying redress for others, such legislative classifications must conform to the equal protection guarantees of the state and federal Constitutions.

Other courts have been presented with the equal protection challenges to the statutory application of governmental immunity. (See *Flournoy v. State of California*, 230 Cal. App. 2d 520, 41 Cal. Rptr. 190 [Dist. Ct. App. 1964]; *Sullivan v. Midlothian Park Dist.*, 51 Ill. 2d 274, 281 N. E. 2d 659 [1972]; *Knapp v. Dearborn*, 60 Mich. App. 18, 230 N. W. 2d 293 [1975]; *Kriger v. Mutual Aid Pact*, 49 Mich. App. 7, 211 N. W. 2d 228 [1973].) In each of these cases the challenged statutory classifications based governmental liability on the *function* of governmental entities. The traditional equal protection test was applied and, in each case, a rational basis for the legislative classification was found. In *Brown v. Wichita State University*, supra, such a rational basis was found wanting.

The majority cites no cases and my research reveals none which remain good authority for the proposition that a Legislature possesses *unlimited* power to statutorily grant or deny governmental liability in tort. That such legislative action is subject to the requirement of some rationality is illustrated by *Harvey v. Clyde Park Dist.*, 32 Ill. 2d 60, 203 N. E. 2d 573. There a statute making governmental immunity turn on the character of *the governmental unit involved*, as does K. S. A. 46-901 *et seq.*, was held to violate an "equal protection" provision of the state Constitution by being arbitrary, irrational and unconstitutionally discriminatory.

Sections 1 and 2 of the Bill of Rights of the Kansas Constitution are our counterparts to the Fourteenth Amendment to the United States Constitution and are given the same effect as that amendment's Due Process and Equal Protection Clauses. The sections provide in substance that "[A]ll men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness," and that ". . . all free governments

. . . are instituted for [the] equal protection and benefit [of the people]." (*Henry v. Bauder,* 213 Kan. 751, 518 P. 2d 362.)

The Fourteenth Amendment to the United States Constitution provides that no state shall ". . . deny to any person within its jurisdiction the equal protection of the laws."

Although some jurists have suggested the right of reasonable access to the courts without the consent of government is just as fundamental as other "fundamental rights" recognized by the United States Supreme Court, (*see Lunday v. Vogelmann,* 213 N. W. 2d 904, 908 [Iowa 1973] [Reynoldson, J., dissenting]; *Krause v. State,* 31 Ohio St. 2d 132, 150 n. 14, 285 N. E. 2d 736, 747 n. 14 [1972] [Brown, J., dissenting]) the high court has not yet denominated such right as "fundamental." Therefore, the less restrictive "reasonable relation" equal protection test is applicable. This test gives great deference to the legislative classification.

Under the "reasonable relation" test only invidious discrimination offends equal protection guarantees; reasonable classifications of persons are permissible. Distinctions inherent in a particular classification must furnish a proper and reasonable basis for such classification, and the classification cannot be made arbitrarily. (*Manzanares v. Bell,* 214 Kan. 589, 522 P. 2d 1291; *Henry v. Bauder,* 213 Kan. 751, 518 P. 2d 362; *Pinkerton v. Schwiethale,* 208 Kan. 596, 493 P. 2d 200.)

In *Rinaldi v. Yeager,* 384 U. S. 305, 308-09, 16 L. Ed. 2d 577, 580, 86 S. Ct. 1497, the United States Supreme Court stated:

"The Equal Protection Clause requires more of a state law than non-discriminatory application within the class it establishes. . . . It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. . . . Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' . . ."

In *James v. Strange,* 407 U. S. 128, 32 L. Ed. 2d 600, 92 S. Ct. 2027, the United States Supreme Court, relying on *Rinaldi,* ruled the discriminatory treatment of a class created by a Kansas statute violated the Equal Protection Clause, notwithstanding a finding that the statutory classification might further legitimate state interests and that all members of the class were treated alike.

In *Reed v. Reed,* 404 U. S. 71, 75-76, 30 L. Ed. 2d 225, 229, 92 S. Ct. 251, 253-54, it was said:

". . . [T]his Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. . . . The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U. S. 412, 415 (1920). . . ."

In *Henry v. Bauder,* supra, at 753, 518 P. 2d at 365, we said:

". . . The concept of equality of all citizens under the law is, of course, basic to our free society. We have stated that classifications may not be created arbitrarily, discriminatorily or unreasonably, or the principle of equality would be violated. There must be some difference in character, condition, or situation, to justify distinction, and this difference must bear a just and proper relation to the proposed classification and regulation; otherwise, the classification is forced and unreal, and greater burdens are, in fact, imposed on some than on others of the same desert."

From the above, it is apparent that when a statute provides one class is to be treated differently from another, equal protection requires (1) the legislation apply alike to all within the class and (2) reasonable grounds must exist for making a distinction between those who fall within the different classes.

K. S. A. 46-901 *et seq.,* creates two classes of governmental entities: (1) the state and (2) all others. It treats the state differently than all other levels of government by making it completely immune from liability and suit on any implied contract, negligence or tort action except as specifically provided otherwise by statute. All other levels of government are subject to liability for injuries caused by "proprietary" activities. K. S. A. 46-902 (a); *Carroll v. Kittle,* supra, Syl. 6.

K. S. A. 46-901 *et seq.,* also creates two classes of persons. Victims of the tortious conduct of the state are placed in one class; victims of the tortious conduct of all other governmental entities, in another.

The Fourteenth Amendment prohibits unreasonable classification of *persons.* It is the classification of persons which results from K. S. A. 46-901 *et seq.,* which must satisfy equal protection guarantees.

Appellees argue and the majority agrees that K. S. A. 46-901 and 902 treat similarly situated persons in a similar manner—that all persons within each class created by the statute are treated equally. To

the extent that each person injured by tortious acts of the state is absolutely barred from seeking recovery while each person injured by tortious acts of any other level of government may seek redress in the courts, it is true that similarly situated persons receive similar treatment. However, the practical effect of K. S. A. 46-901 and 902 is that similarly situated persons do *not* receive similar treatment.

Local units of government are creatures or instrumentalities of the state which, along with the state, exercise state power. In *Eikenberry v. Township of Bazaar*, supra, at 391 [*561], this court noted: "[A]ll the powers with which [the townships] are intrusted are the powers of the state, and all the duties with which they are charged are the duties of the state." In *Caywood v. Board of County Commissioners*, 194 Kan. 419, 399 P. 2d 561, we presented a compendium of cases holding counties are agents of the state and auxiliaries to state government. Likewise, in *Parker v. City of Hutchinson*, 196 Kan. 148, 410 P. 2d 347, we noted that municipalities are arms and agents of the state and the immunity they enjoy flows from the state. Where two persons are each injured by an arm of the state yet only one may seek redress in the courts, they are *not* treated equally although they *are* similarily situated. Consequently, the classifications created by K. S. A. 46-901 and 902 fail to satisfy the first requirement of equal protection.

But even if K. S. A. 46-901 and 902 did treat similarly situated persons in a similar manner, the equal protection inquiry would not be ended. To pass constitutional muster, there must also be a reasonable ground for making a distinction between the classes created by the statute.

Without question, the statute is discriminatory. Without question, it causes serious inequality for persons within the jurisdiction of this state. But it is only "invidious discrimination" which offends the constitutional guaranty of equal protection. (*Ferguson v. Skrupa*, 372 U. S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A. L. R. 2d 1347.) Statutory classifications, although discriminatory, are not invidious if based on reasonable grounds. Only when the distinction between the statutorily created classes lacks rationality, does the statute fall under equal protection.

Giving great deference to legislative wisdom, courts will not set aside a statutory discrimination "if any state of facts reasonably may be conceived to justify it." (*McGowan v. Maryland*, 366 U. S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101.) The majority opinion claims three interests—three states of fact which may reasonably

be conceived—justify the legislative classification and thereby uphold the statute. These three interests are: (1) the need to protect the state treasury; (2) the need for government to be able to function unhampered by the threat of time and energy consuming legal actions; and (3) the need to protect government in the high-risk activities it performs. None of these apologetics purporting to show the rationality of the statutorily created classes withstand careful analysis.

Governmental immunity persists today primarily because of inertia and financial fears. Leflar & Kantrowitz, *Tort Liability of the States,* 29 N. Y. U. L. Rev. 1363, 1364 (1954); Sherry, *The Myth That the King Can Do No Wrong: A Comparative Study of the Sovereign Immunity Doctrine in the United States and New York Court of Claims,* 22 Ad. L. Rev. 39, 54 (1969) [hereinafter cited as Sherry].

"[The doctrine's survival is but a]  .  .  .  state of mind conditioned by the spectre that its relinquishment will bankrupt the sovereign and result in governmental paralysis. Such a theory may well have been justifiable in colonial times. But today there is universal agreement that immunity has far outlived its usefulness and is a discredited relic of the past not consonant with the needs of civilized society." Sherry at 57.

Fears have frequently been expressed that the removal of governmental immunity would result in dissipation of public funds, the curtailment or disruption of essential governmental functions and the forced insolvency of public entities. Yet experience does not bear out these fears. Since the federal government assumed responsibility for its torts with the enactment of the Federal Tort Claims Act in 1946, it has not suffered financial ruin. A number of states as well as many foreign countries have also adopted comprehensive rules of government responsibility in tort without suffering the above feared consequences. See Blades, *A Comment on Governmental Tort Immunity in Kansas,* 16 Kan. L. Rev. 265 (1968), [hereinafter cited as Blades]. Cities have long been subject to varying degrees of liability in tort, yet it has never been shown that adverse tort judgments have forced a city into insolvency proceedings or caused a serious threat to financial stability. *See O'Dell v. School District of Independence,* supra, at 417 (Finch, J., dissenting); *Ayala et al. v. Phila. Bd. of Pub. Educ.,* 453 Pa. 584, 305 A. 2d 877; David, *Tort Liability of Local Government: Alternatives to Immunity from Liability or Suit,* 6 U. C. L. A. L. Rev. 1 (1959). In the more than thirty years since the doctrine of charita-

ble immunity began its decline, there is no indication in the states abolishing it that donations have diminished, that funds in charitable institutions have been depleted or that the mortality of charitable institutions has increased. (*President and Dir. of Georgetown College v. Hughes,* 130 F. 2d 810 [D. C. Cir. 1942]; *O'Dell v. School District of Independence,* supra, at 417 [Finch, J., dissenting].) In short, governmental immunity is not necessary to protect the state treasury. Experience indicates that the state treasury would not fall to rack and ruin if the shield of immunity were lifted.

In abrogating governmental immunity for all levels of government in New Mexico, the court in *Hicks v. State,* 88 N. M. 588, 590, 544 P. 2d 1153, 1155 (1975), made some remarks relevant to our present discussion:

". . . The argument has been presented that the elimination of sovereign immunity will result in an intolerable financial burden upon the State. We believe it is safe to say that adequate insurance can be secured to eliminate that possible burden in a satisfactory manner. In addition, it would appear that placing the financial burden upon the State, which is able to distribute its losses throughout the populace, is more just and equitable than forcing the individual who is injured to bear the entire burden alone. . . ."

There are several techniques through which government can absorb the burden and spread the cost of government responsibility for tort. Liability insurance offers a buffer. Distribution of the losses from government maladministration can also be achieved through taxation. In any event, it is readily apparent that the shield of governmental immunity is not a necessity to protect the state treasury.

That this "interest" fails to show the rationality of the statutorily created classes was aptly stated in Comment, *Governmental Immunity in Kansas: Prospects for Enlightened Change,* 19 Kan. L. Rev. 211, 224 (1971):

". . . [T]his classification of governmental agencies is irrational because it contradicts the major policy rationale behind the immunity doctrine. The argument advanced is that abrogation of immunity will cause the financial breakup of the government. The state has more assets than any other governmental body and is thus better able to resist a breakup. But the statute renders the state immune while allowing other entities, less able to pay, to be held liable. Thus, this classification permits plaintiffs to have a remedy only against the governmental agencies least able to bear the burden. This is not a rational classification."

The necessity of protecting the state treasury fails as a rational justification for discriminating between those persons who fall within the different classes created by K. S. A. 46-901 and 902.

The second "interest" cited as justifying the discriminatory classifications is equally indefensible. To say that government needs to be able to operate unhampered by the threat of legal actions intimates that the state should not be bothered by the fact it has injured people because it has more important things to do.

". . . A government 'of, by and for the people' derives its strength from being just and reasonable and not irresponsible in its dealings with the people. . . . 'To submit, in justification of the rule, that the immunity is necessary for the proper functioning of [government], is to propound the obvious contradiction that the agency formed to protect society is under no obligation, when active itself, to protect an individual member of society.'" Blades at 267-68.

To say that the threat of legal actions will intolerably hamper government activities is to say that government alone, among all our institutions, cannot properly function if it shoulders responsibility for its actions.

". . . For negligent or tortious conduct liability is the rule. Immunity is the exception. Human beings ordinarily are responsible for their own legally careless action. They respond also for negligent harms inflicted by their agents and employees. So do business corporations. Likewise trustees and other fiduciaries generally are liable for their own negligence in administration and operation of the business or property committed to their control. . . ." (President and Dir. of Georgetown College v. Hughes, supra, at 812.)

There is little doubt that immunity fosters neglect and breeds irresponsibility, while liability promotes care and caution. (Noel v. Menninger Foundation, 175 Kan. 751, 267 P. 2d 934; O'Dell v. School District of Independence, supra, at 415.) Looking at the experience of foreign countries, the federal government, other state governments, certain local governmental entities in this state, as well as that of business, commerce and private individuals, I am unable to see the rationality of justifying the discrimination resulting from K. S. A. 46-901 and 902 on the ground it is necessary for the proper administration of state government.

The third "interest" cited by the majority is the need to protect government in high-risk activities which it, of necessity, performs. Is this a state of facts which justifies the statutory discrimination and gives rationality to the distinction made beween the statutorily created classes? Implicit in this state of facts are two assumptions: (1) that governmental entities performing such "high-risk" activities need the protection of immunity for their financial security and (2) that the public needs to have these governmental entities so protected to insure essential services will not be curtailed. But

experience in other jurisdictions indicates absolute immunity in even these "high-risk" activities such as law enforcement is necessary neither for the financial security nor for the proper functioning of government. (*E. g. Mason v. Bitton,* 85 Wash. 2d 321, 534 P. 2d 1360 [1975].) Not only does K. S. A. 46-901 *et seq.,* give such high-risk activities complete immunity, except as modified by other statutes, it completely immunizes *all* state activities. The statute paints with an overly broad brush.

" '. . . [T]oday cities and states are active and virile creatures capable of inflicting great harm, and their civil liability should be co-extensive. Even though a governmental entity does not profit from its projects, the taxpaying public nevertheless does, and it is the taxpaying public which should pay for governmental maladministration. If the city operates or maintains injury-inducing activities or conditions, the harm thus caused should be viewed as a part of the normal and proper costs of public administration and not as a diversion of public funds. The city is a far better loss-distributing agency than the innocent and injured victim. See 2 Harper and James, Torts, 622 (1956).' " *Ayala et al. v. Phila. Bd. of Pub. Educ.,* supra, at 594-95.

But all three "interests" fail as reasonable justifications for making a distinction between the classes created by the statute for an even more basic reason: the arguments supporting discrimination in favor of the state apply equally well to other governmental entities. If the state treasury needs protection, why do the treasuries of lesser units of government not need it even more? If the state must be free from the bother of threatened legal actions, how can cities and counties perform their essential public services without the same protection? While many levels of government perform certain "high-risk"activities, why does only the state need the complete protection afforded by the statute? The three "interests" simply do not provide a rational justification for the statutory discrimination resulting from K. S. A. 46-901 and 902.

The difference in immunity protection given the state and other governmental entities in Kansas has long perplexed this court. In *Carroll v. Kittle,* supra, at 847, 457 P. 2d at 27, we said: "It is difficult for the majority of the court to see why one governmental agency [city, county, state, etc.] performing precisely the same acts . . . should be liable for negligence and others should not." In *Carroll* we also said: ". . . the rule of governmental immunity from liability for torts committed while engaged in proprietary functions is today *without rational basis.* . . ." (*Id.* at 850, 457 P. 2d at 29 [emphasis added].) In *Wendler v. City of Great Bend,* 181 Kan. 753, 759, 316 P. 2d 265, 270, Mr. Justice Schroeder, speak-

ing for the court, said: "What justifies the difference [in immunity protection] between the State and its municipal subdivisions is baffling." What justifies the irrational, discriminatory classifications of K. S. A. 46-901 *et seq.*, is equally baffling.

It is illogical, irrational and unfair to premise the availability of remedies upon the nature of the governmental entity causing the harm. As previously noted, local units of government are creatures or instrumentalities of the state which, along with the state, exercise state power. Yet a patient injured in a city or county hospital may seek redress in our courts while his neighbor, injured by an identical act of negligence in the State University Medical Center, may not. Each was harmed by an arm of the state, yet redress is allowed only one. The statutory classifications of K. S. A. 46-901 and 902 which cause such discrimination are without rational basis and consequently violate equal protection guarantees.

In *Sanders v. State Highway Commission,* 211 Kan. 776, 508 P. 2d 981, we held that the State Highway Commission was liable for undermining a property owner's backyard. There, as a result of excavation along a roadway, a sizable portion of plaintiff's backyard caved in. The state was required to respond in damages. Had the Sanders or their children fallen with the dirt and suffered injury or death, K. S. A. 46-901 *et seq.*, would allow no remedy. Such discrimination against personal rights and in favor of property rights makes the statute even more irrational.

The foregoing examples merely serve to illustrate what is by now obvious—that the practical effect of K. S. A. 46-901 and 902 is invidious discrimination of the rankest kind. Persons falling within the same class created by the statutes do not receive equal treatment; the distinctions made between the classes are without rational basis. Such discrimination fails to conform to the equal protection guarantees of the state and federal Constitutions.

The majority attempts to distinguish *Harvey v. Clyde Park District,* 32 Ill. 2d 60, 203 N. E. 2d 573, on both a factual and constitutional basis, but that case is strikingly appropriate to the instant decision. In *Harvey,* a statute barred plaintiff's recovery for injuries sustained through the negligence of a park district. Plaintiff challenged that statute as violating provisions of the Illinois Constitution in light of the statutory pattern applying governmental immunity to other governmental entities. By statute, Illinois had applied varying degrees of governmental immunity to all levels of government. Although the Constitution prohibited suits against

the state, the Legislature had effectively eliminated the state's governmental immunity by establishing a court of claims with jurisdiction over tort claims against the state and by eliminating the defense of governmental immunity in such claims. *Id.* at 64, 203 N. E. 2d at 575. If the plaintiff in *Harvey* had sustained his injury in a park operated by a city or village, there would have been no legislative impediment to full recovery. If such injury had occurred in recreational facilities maintained by a school district or the state, limited recovery could have been had. Recovery for such injury occurring in a forest preserve district or park district was absolutely barred. The *Harvey* court could find "no discernible relationship to the realities of life" in this statutory pattern and held the statute barring plaintiff's recovery was arbitrary, irrational and discriminatory. *Id.* at 67, 203 N. E. 2d at 577.

Such a statutory scheme making recovery depend entirely on a fortuitous circumstance—what level of government the tort-feasor happens to be—is directly analogous to K. S. A. 46-901 *et seq.* The discrimination resulting from K. S. A. 46-901 *et seq.,* is equally irrational and equally unconstitutional.

Differences in the Illinois constitutional provision violated in *Harvey* and Section 2 of the Kansas Bill of Rights do not render *Harvey* meaningless authority as the majority suggests. In light of *Henry v. Bauder,* supra, earlier holdings that Section 2 of the Kansas Bill of Rights applies only to *political privileges* are rendered suspect. In *Henry,* the Kansas Guest Statute was held to violate Sections 1 and 2 of the Kansas Bill of Rights and the Equal Protection Clause of the Fourteenth Amendment by denying recovery for *personal injury* in an arbitrary, discriminatory and irrational manner. *Id.* at 754, 518 P. 2d at 366. In the instant action, K. S. A. 46-901 *et seq.,* infringes on similar rights in violation of the equal protection provisions of the Kansas and United States Constitutions.

More importantly, the rationale applied to test compliance with the Illinois constitutional provision is directly analogous to the rationale by which compliance with the Fourteenth Amendment Equal Protection Clause and Section 2 of the Kansas Bill of Rights is tested. Sections 1 and 2 of the Kansas Bill of Rights are given much the same effect as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (*Manzanares v. Bell,* supra; *Henry v. Bauder,* supra; *Tri-State Hotel Co. v. Londerholm,* supra.) The Fourteenth Amendment requires there be a *rational basis* for legislating different treatment for classes created

by statute. When a statute is challenged as violating Section 22 of Article 4 of the 1870 Illinois Constitution (now Section 4 of Article 13 of the 1970 Constitution), "[t]he determinative question . . . is whether the statutory classification is *rational.*" (*Harvey v. Clyde Park District*, supra, at 64, 203 N. E. 2d at 575.) (Emphasis added.) The rationale of the *Harvey* court and its treatment of the statutory pattern of discrimination is clearly analogous to the instant case.

The majority says that if K. S. A. 46-901 and 902 are unconstitutionally arbitrary and irrational, then *any* statutory classification applying governmental immunity must be similarly defective. This conclusion is fraught with logical inconsistencies. While it is true that all statutory classifications discriminate against certain persons, it does not follow that all classifications applying governmental immunity are equally discriminatory and equally irrational. Not all such statutory classifications invidiously discriminate. As the *Harvey* court noted, its holding the statutory classification based on level of government was unconstitutionally discriminatory did not mean no valid classification for the purposes of tort liability was possible. The court said it was feasible and perhaps desirable to classify in terms of types of governmental functions instead of classifying in terms of different governmental agencies that perform the same function. The tort claims acts of the federal government, California and Michigan are all examples of statutes applying governmental immunity based on *functional* distinctions. (See 28 U. S. C., § 2671 *et seq.;* Cal. Gov't Code, § 810 *et seq.;* Mich. Stat. Ann. § 3.996 [107].)

*Kriger v. Mutual Aid Pact,* 49 Mich. App. 7, 211 N. W. 2d 228, is another illustration that there may be a rational basis for a statutory classification applying governmental immunity based on governmental *function.* Michigan has, by statute, equalized governmental immunity for all levels of government. (Mich. Stat. Ann. § 3.996 [107].) All governmental entities are immune from liability for injuries arising from "governmental" functions; all are subject to liability for injuries arising from "proprietary" functions. In *Kriger,* an equal protection challenge to the statute failed; the court found a reasonable basis for the statutory classification.

Although the "governmental-proprietary" distinction still has vitality, as we noted in *Brown v. Wichita State University,* supra, it is not the only functional distinction applying uniformly to all units of government that can be made, nor is it necessarily the most de-

sirable. Implicit in any such distinction is the recognition that "it is not a tort for government to govern." (*See, Dalehite v. United States*, 346 U. S. 15, 57, 97 L. Ed. 1427, 1452, 73 S. Ct. 956, 979 [Jackson, J., dissenting].) Other functional distinctions may be more workable and less confusing than the "governmental-proprietary" one which has been condemned by courts and commentators. (*See, e. g.*, W. Prosser, Laws of Torts, § 131, at 979 [4th ed. 1971].) The Restatement (Second) of Torts, Ch. 45A (Tent. Draft No. 19, 1973), reflecting the reasoned view of many of our best legal minds, offers a useful guide for the application of governmental immunity.

Under the Restatement view, liability is the rule and immunity the exception. Within that exception are acts or omissions constituting the exercise of a judicial or legislative function. These are immune because an action in tort for damages is neither the appropriate form of review of such acts or omissions nor a suitable remedy. Likewise, all legislative acts or omissions and those executive acts or omissions involving basic policy decisions are immune because the courts should not pass judgment on such policy decisions of coordinate branches of government. But immunity is not retained for executive and administrative acts not involving basic governmental policy decisions. For these acts or omissions, all levels of government are subject to liability. For example, a governor's decision to activate the National Guard and a state hospital orderly's decision to leave a mop in a hallway are both decisions of a state officer or employee involving some discretion. Only one involves a basic governmental policy decision. The Restatement would give immunity for only the governor's action; K. S. A. 46-901 gives immunity to both.

The Restatement notes that elimination of general tort immunity does not establish liability for acts or omissions which are otherwise not tortious. Actions of a governmental officer or employee may be *privileged* under regular principles of tort law. A privilege defeats the existence of the tort itself; an immunity, on the other hand, admits the tort, but bars any resulting liability. (W. Prosser, Laws of Torts 970 [4th ed. 1971].) Likewise, the state's failure to perform a service or provide a benefit is not tortious if it has no affirmative duty to act.

Little need be said about due process. To pass constitutional muster under the due process provisions of our state and federal Constitutions, a statute must bear a reasonable relation to a permissible legislative objective. (*Manzanares v. Bell*, supra.) That

the application of governmental immunity is a permissible legislative objective is illustrated by the tort claims acts of the federal government and many other states. However, the element of *reasonableness* is also required to satisfy the due process test. Due process considerations cannot be isolated from the foregoing discussion baring the stark irrationality of the statutory classifications created by K. S. A. 46-901 and 902. The "interests" advanced by the majority, which fail to provide a rational basis for the statutory discrimination, likewise fail to satisfy the reasonableness requirement of due process. For these reasons and those more fully set forth in *Brown v. Wichita State University,* supra, I would affirm the court's holding in *Brown* that K. S. A. 46-901 and 902 violate the guarantee of due process of law as provided in the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights.

Clearly, there are constitutionally permissible ways in which the Legislature may apply governmental immunity in Kansas. But just as clearly, the line K. S. A. 46-901 *et seq.,* draws between immunity and liability fails to conform to constitutional requirements. Governmental immunity offers great possibilities for abuse of the individual by the oppressive hand of government. It should be applied with great caution.

". . . The doctrine, which was originally promulgated to immunize a weak government against oppressive and insensitive individual demands, has in its present form outlived its usefulness. Today it is the citizen who is helpless when faced with increasing governmental intrusion in his daily life. It is likely that this intrusion will grow as our society becomes even more complex and difficult to manage. The results of governmental presence are and will continue to be frequently unpredictable and sometimes tragic. Because the immunity doctrine is an anachronism, and also because, uncontrolled, it is a threat to our collective sense of justice, prompt legislative and judicial modifying action is necessary." Comment, *Governmental Immunity in Kansas: Prospects for Enlightened Change,* 19 Kan. L. Rev. 211, 214-15 (1971).

Webster's Third New International Dictionary, unabridged, defines "anachronism" as a thing that is chronologically out of place— something that belongs to a former age and is incongruous if found in the present. What better example than governmental immunity. "The social climate which fostered the growth of absolutism . . . has long since been tempered with the warm winds of humanitarianism and individual freedom." Smith, *Municipal Tort Liability,* 48 Mich. L. Rev. 41, 48 (1949). Once the people existed

for the sovereign; today, our government is of, by and for the people. Once it was thought better that an individual sustain an injury than the public suffer an inconvenience; today, imposing the entire burden of government's wrongful acts on the single injured individual is abhorrent to our social philosophy. A fundamental concept of our system of laws is that one may seek redress for every substantial wrong. Today, there is widespread acceptance of the philosophy that those who enjoy the fruits of an enterprise must accept the burden of its risks and responsibilities. Yet the shield of governmental immunity persists—an enigma perpetuated by inertia and unfounded financial fears.

Governmental immunity as applied by K. S. A. 46-901 and 902 is completely contradictory to the principles on which our government is based—that government exists for the benefit of the people and must be held responsible to them. In 1976, insulating state government at the expense of the personal well-being of the people shocks the conscience. To maintain a system of laws whereby we are individually liable but collectively immune is more than irrational, it is immoral.

The Legislature may choose to respond with indifference to the majority's affirmation of the existing statutory application of governmental immunity in Kansas. I can only hope that, instead, the Legislature will respond to this decision of the court with a critical and searching re-examination of these statutes. An abundance of evidence is at hand which convincingly demonstrates it is both desirable and feasible that government at all levels accept increased responsibility for its actions. I look forward to the day the Legislature enacts new measures more in keeping with the needs of Kansas citizens and Kansas government.

I concur in the majority's affirmance of the first thirteen syllabi and the corresponding portions of the court's opinion in *Brown v. Wichita State University*, supra. I would adhere to the court's holding in *Brown* that the doctrine of governmental immunity as applied by K. S. A. 46-901 and 902 violates the guarantees of equal protection and due process of law as provided in the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Bill of Rights, and I would direct the district court to proceed to trial on all viable issues sounding in tort and contract.

OWSLEY and PRAGER, JJ., join in the foregoing dissent.