No. 125,528

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ASHLEY CLINIC, LLC,
*Appellee/Cross-Appellant*,

v.

SCOTT COATES, M.D., and LABETTE COUNTY
MEDICAL CENTER d/b/a LABETTE HEALTH,
*Appellants/Cross-Appellees*.

SYLLABUS BY THE COURT

1.

When a verdict is attacked on the ground it is contrary to the evidence, appellate courts do not reweigh the evidence or reassess the credibility of the witnesses. Appellate courts will not disturb the jury's verdict if the evidence and all reasonable inferences drawn from the evidence, considered in the light most favorable to the successful party, support the jury's findings.

2.

Kansas courts presume that written contracts are valid and supported by adequate consideration. The jury is entitled to presume that a written contract is valid unless the party contesting its validity proves it is not.

3.

Continued employment can be sufficient consideration to support an employment contract, including one that adds a covenant not to compete.

1

4.

A party claiming tortious interference with a contract must show that the offending party knew of an existing contractual relationship and nevertheless intentionally induced one of the contracting parties to breach that agreement, causing damages to the claimant. A person intentionally induces a breach when they act with actual or legal malice.

5.

Legal malice is the intent to do harm without any reasonable justification or excuse.

6.

Interference with a contract may be justified—and thus not tortious—in certain instances, including if the interference occurs for a legitimate business purpose. Whether such a justification exists turns on several factual questions, including the defendant's motives, the proximity of the defendant's conduct to the interference, and the means employed.

7.

Damages need not be established with absolute certainty. Instead, a party claiming that it has been injured as a result of another's wrongful acts must show the extent of its injury—that is, the amount of damages it suffered—with reasonable certainty. This requires some reasonable basis for computation that will enable the jury to arrive at an approximate estimate of the damages.

8.

To succeed on a claim for unjust enrichment, a person must show that they have conferred a benefit upon another party; that the other party knew of or appreciated that benefit; and that the circumstances surrounding the benefit make it inequitable for the other party to retain it without payment for its value.

9.

The Kansas Tort Claims Act, K.S.A. 75-6101 et seq., distinguishes between traditional governmental functions—such as legislative, judicial, and executive enforcement actions—and other circumstances when a governmental entity is carrying out actions that could also be performed by private individuals.

10.

The Kansas Tort Claims Act, K.S.A. 75-6101 et seq., applies to a claim of tortious interference with a contract against a county hospital.

11.

The Kansas Tort Claims Act's damages limitations, including K.S.A. 75-6105(a)'s cap on total damages and K.S.A. 75-6105(c)'s prohibition of punitive damages, do not violate the right to a jury trial enshrined in section 5 of the Kansas Constitution Bill of Rights.

12.

Kansas law does not prohibit a district court from awarding duplicative damages against separate defendants based on different conduct and different theories of recovery. But Kansas law prohibits a party from recovering duplicative damages from separate defendants where the damages arise from the same injury or loss.

Appeal from Neosho District Court; ROBERT J. FLEMING, judge. Oral argument held September 19, 2023. Opinion filed March 15, 2024. Affirmed.

*Mark A. Cole*, *Barry L. Pickens*, and *Anna G. Schuler*, of Spencer Fane LLP, of Overland Park, for appellants/cross-appellees.

*Frankie J. Forbes* and *Quentin M. Templeton*, of Forbes Law Group, LLC, of Overland Park, and *Brandon J.B. Boulware*, of Boulware Law LLC, of Kansas City, Missouri, for appellee/cross-appellant.

Before COBLE, P.J., MALONE and WARNER, JJ.

WARNER, J.: This case concerns the application and effect of a noncompete clause in an employment agreement between Dr. Scott Coates and his former workplace, Ashley Clinic, LLC. After a six-day trial, a jury found that Coates had breached that employment agreement when he went to work for Labette County Medical Center and that Labette tortiously interfered with Coates' employment agreement with Ashley Clinic. Labette and Coates now challenge many aspects of that trial. In a cross-appeal, Ashley Clinic challenges the district court's enforcement of the damage cap in the Kansas Tort Claims Act as well as the district court's denial of an equitable claim for unjust enrichment. After carefully reviewing the record and the parties' arguments, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The dispute at the heart of this case involves Coates' decision to end his relationship with Ashley Clinic and to work for Labette. Labette is a county hospital organized under K.S.A. 19-4601 et seq. It is based in Parsons but operates a healthcare center in Montgomery County and a clinic in Neosho County (in Chanute).

*Coates' professional relationship with Ashley Clinic*

After finishing his medical training in general surgery, Coates moved to southeast Kansas to work for Ashley Clinic in 2001. Although Ashley Clinic's principal office is in Chanute, the clinic requested that Coates establish his practice in Iola. After a few years, Coates transitioned much of his practice from Iola to Chanute.

Ashley Clinic initially hired Coates as a salaried employee for its surgery practice. A couple of years later, Coates became a member of Ashley Clinic. In doing so, he

4

became a party to the clinic's operating agreement, which set forth the rules and regulations about management and business of the clinic, the rights and privileges of the members, and various other mutual covenants.

In 2006, Coates—along with the other members of the clinic—signed an amended employment agreement. This agreement, which was motivated in part by a physician's decision to leave the clinic and open a competing practice, stated that Coates agreed he would not provide "medical services, especially the practice of General Surgery, within Neosho, Allen, Woodson, Wilson, Montgomery or Labette Counties" for two years after leaving the clinic. (These six counties are where the clinic's patients are generally located.) Because the extent of injuries stemming from the violation of this provision would be difficult to ascertain, the agreement provided that any breach of the restriction would lead to liquidated damages "in an amount equal to [200%] of the salary and bonus that was paid to [Coates], prior to any breach."

In 2016, Ashley Clinic and its members executed an amended operating agreement. Unlike the previous operating agreement, which did not contain any specific limitations on competition, the 2016 operating agreement stated that no member would engage in any business that could "jeopardize any business relationship the [clinic] has with any customer, client, patient, vendor or supplier of the [clinic]." Coates signed this agreement.

*Coates' departure from Ashley Clinic*

After working at Ashley Clinic for several years, Coates started looking for a different position. Since his family was in Chanute, he hoped to find a job in the area so he could raise his own family nearby. He sent letters to multiple local hospitals explaining his situation, including a letter to Brian Williams, the CEO at Labette. Coates narrowed his search to three hospitals: Neosho Memorial, Coffey Health, and Labette.

Eventually, Labette extended an offer to Coates. During conversations leading up to this offer, Williams and Coates discussed the noncompete provision in Coates' 2006 employment agreement with Ashley Clinic. Labette's attorney analyzed this provision and concluded that it prevented Coates from practicing within the six-county region, which included Labette's medical offices in Neosho County, Labette County, and Montgomery County.

Coates signed an employment contract with Labette in June 2019. This contract included a $125,000 "Legal Allowance" to pay legal expenses arising from his decision to leave Ashley Clinic and work at Labette. It also included an indemnity clause, stating:

> "[Labette] Medical Center acknowledges that at the time of signing of this Agreement that [Coates] is subject to covenants against competition and non-solicitation covenants pursuant to his current Employment Agreement with the Ashley Clinic, LLC, and other agreements with the Ashley Clinic, LLC and its affiliates that restrict [Coates] from entry into and full performance of Physician's obligations pursuant to this Agreement. Accordingly, [Labette] assumes the full risk to it of any and all losses, damages, costs expenses and attorneys' fees it may incur that arise from any claim, action, or proceeding of any kind or nature that may be brought against [Labette] by the Ashley Clinic."

Later that month, Coates notified Ashley Clinic that he would be leaving the clinic in August.

*Ashley Clinic's lawsuit against Coates and Labette*

Ashley Clinic filed suit against Coates and Labette. It sought an injunction preventing Coates from practicing medicine in the area and damages relating to breach of the noncompete provision in Coates' employment agreement. Ultimately, Ashley Clinic raised 12 claims against Coates and Labette. Relevant here, Ashley Clinic argued:

- Coates breached the noncompete provision in the 2006 employment agreement by practicing general surgery at Labette's clinics in Chanute and Independence, as well as at its hospital in Parsons.

- Coates breached a 2003 confidentiality agreement by disclosing confidential information to multiple third parties.

- Labette tortiously interfered with the 2006 employment agreement between Coates and Ashley Clinic by intentionally inducing Coates to breach the noncompete clause in that agreement.

- Labette was unjustly enriched by the compensation it received for the medical services that Coates performed.

As the case progressed, Ashley Clinic sought permission to add a claim for punitive damages against Labette. The district court invited the parties to file supplemental briefing on several legal issues about the application of the Kansas Tort Claims Act (KTCA), including whether the KTCA's cap on compensatory damages was constitutional and applicable, whether punitive damages were available, and whether the KTCA would apply to Labette if it conducted business outside of Labette County.

In response, Coates and Labette argued that the KTCA prohibited Ashley Clinic from asserting punitive damages against Labette because Labette is a governmental entity. And Coates and Labette argued that the Act's damage cap—contained in K.S.A. 75-6105(a)—limited Ashley Clinic's recovery of compensatory damages to a maximum amount of $500,000. Ashley Clinic disagreed and urged the district court to defer its rulings until after trial.

The district court ultimately denied Ashley Clinic's request to add a claim for punitive damages. The case then proceeded to a jury trial. The jury found that Coates had

7

breached the confidentiality agreement and the 2006 employment agreement, causing a total of $472,913.50 in damages. The jury also found that Labette had tortiously interfered with the 2006 employment agreement between the clinic and Coates, causing $739,523.06 in damages. The district court ruled in Labette's favor on the clinic's equitable claim for unjust enrichment, finding the clinic had conferred no benefit on Labette that required further compensation.

Following the trial, the district court found that the KTCA applied to Ashley Clinic's tortious-interference claim against Labette and thus reduced the damages on that claim from $739,523.06 to $500,000. The court then entered judgment in favor of Ashley Clinic against Coates for $472,913.50 ($9,437.50 for breaching the confidentiality agreement and $463,476 for breaching the employment agreement) and against Labette for $500,000.

DISCUSSION

Coates and Labette now appeal the respective judgments against them, challenging numerous evidentiary bases for the jury's verdict and raising arguments regarding the legality of the district court's ultimate damage awards. Ashley Clinic cross-appeals the district court's decisions under the KTCA—capping the damages against Labette and denying the clinic's claim for punitive damages—and the court's adverse ruling on its unjust-enrichment claim.

Given the intertwining and sometimes overlapping nature of these arguments, we examine them in the order they were presented at trial. We thus begin our discussion with evidentiary challenges to the verdict.

1. *Coates' and Labette's challenges to the jury verdict*

After hearing several days of testimony, the jury found that Coates had breached his confidentiality agreement and the noncompete clause of the 2006 employment agreement. It also found that Labette wrongfully induced Coates to breach the noncompete clause with Ashley Clinic, causing the clinic to suffer $739,523.06 in damages.

Coates and Labette now challenge that verdict from several angles. They argue that the evidence presented at trial did not show that Coates was bound by the noncompete clause in the employment agreement, assailing the proof that the agreement was a valid contract supported by consideration and that Coates was an employee, subject to the agreement's provisions. Labette further asserts that Ashley Clinic did not present evidence of its lost profits to support its tortious-interference claim. And it asserts that Ashley Clinic did not demonstrate that Labette acted with malice, a necessary element of tortious interference with a contract.

The jury is central to our system of justice. Courts rely on jurors to observe witnesses' demeanor, listen to their testimony, and weigh the evidence presented in the context of each party's arguments to determine what versions of events are credible. And once jurors have been instructed on the law, we empower them to apply that law to the facts and render a verdict.

These are not duties appellate courts take lightly. Thus, when a verdict "is attacked on the ground it is contrary to the evidence," we do not "weigh the evidence or pass on the credibility of the witnesses." *Timsah v. General Motors Corp.*, 225 Kan. 305, Syl. ¶ 1, 591 P.2d 154 (1979). We will not disturb the jury's verdict "[i]f the evidence with all reasonable inferences to be drawn therefrom, when considered in a light most favorable

to the successful party below, will support the verdict." 225 Kan. 305, Syl. ¶ 1. With these principles in mind, we turn to the parties' arguments.

### 1.1.  *Evidence that the 2006 employment agreement was valid and enforceable against Coates*

Coates and Labette first argue that the jury erred when it awarded damages based on the 2006 employment agreement between Coates and Ashley Clinic—the agreement containing the noncompete clause at the heart of this case. Coates and Labette attack two aspects of the jury's reliance on that agreement: They assert the 2006 employment agreement was void, claiming the facts at trial showed the agreement was not supported by consideration. And they assert that even if the agreement were valid in the abstract, its provisions do not apply to Coates since he was not an employee but a member of the limited liability company running the clinic. After reviewing the evidence submitted at trial, we find neither argument persuasive.

"Every contract, to be legally enforceable, must be supported by a consideration." *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, Syl. ¶ 8, 606 P.2d 1009 (1980). Consideration in this context is something that is given or given up in exchange for the promises in the contract. It might include "'some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.'" *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 32, 59 P.3d 1003 (2002) (quoting 17A Am. Jur. 2d, Contracts § 113). Whether an agreement is supported by consideration is ordinarily a factual question for the jury. *Evco Distributing, Inc. v. Brandau*, 6 Kan. App. 2d 53, 59, 626 P.2d 1192, *rev. denied* 230 Kan. 817 (1981).

Kansas courts presume that written contracts are valid and supported by adequate consideration. *State ex rel. Ludwick v. Bryant*, 237 Kan. 47, 50, 697 P.2d 858 (1985). The jury here was properly instructed on this principle and thus was entitled to presume that

the 2006 employment agreement, which Coates signed, was valid unless Coates or Labette proved it was not.

Coates and Labette argue that the noncompete provision in the 2006 employment agreement was unenforceable because that agreement added nothing to what Coates was already entitled to receive under the 1999 operating agreement. They point out that the 2006 employment agreement did not change Coates' compensation or alter the fees and expenses the clinic agreed to cover on his behalf.

As a general rule, a person does not make a new promise when they merely agree to do what they were already bound to do. *Cron v. Zimmerman*, 160 Kan. 78, Syl. ¶ 1, 159 P.2d 400 (1945). But Kansas courts have long recognized that continued employment can be sufficient consideration to support a new employment contract, including one that adds "a covenant not to compete." *Puritan-Bennett Corp. v. Richter*, 8 Kan. App. 2d 311, 315, 657 P.2d 589, *rev. denied* 233 Kan. 1092 (1983); see *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 853-54, 185 P.3d 946, *rev. denied* 287 Kan. 769 (2008) ("Dr. Louis' continued employment by the Clinic during a 13-year period constitutes sufficient consideration to support the restrictive covenant.").

The jury heard evidence that signing the 2006 employment agreement allowed Coates to continue his medical practice at the clinic. Another physician at the clinic testified that "all members [were] required to sign [an] amended employment agreement" and that signing the employment agreement was a requirement of "maintaining [their] employment at the Ashley Clinic." The physician explained that "unless you signed it, you weren't going to be able to continue practicing." Thus, there was evidence presented at trial to support the jury's reliance on the 2006 employment agreement because that agreement was based on consideration and thus a valid contract.

11

Coates and Labette also argue that even if the 2006 employment agreement was enforceable in the abstract, it had no effect on Coates since he was a member of the limited liability company, not merely an employee. Broadly speaking, Coates and Labette argue that Coates' actions at the clinic should not be considered those of an employee under various legal tests and statutory frameworks. They devote significant briefing to the question of whether Coates would be an employee under the common-law test Kansas uses for assessing whether an employee-employer relationship exists under the Kansas Wage Payment Act, Kansas Workers Compensation laws, the Kansas Employment Security Act, and tort actions based on vicarious liability. See *Craig v. FedEx Ground Package System, Inc.*, 300 Kan. 788, 793-98, 335 P.3d 66 (2014) (discussing the origins and application of the 20-factor common-law test). They also question whether Coates would be classified as an employee under federal laws governing taxes and family leave.

The statutory frameworks and categories of liability discussed by the defendants impose rights and responsibilities on people based on their legal status as employees, regardless of how they have been classified by their employer. For example, Kansas courts have used the 20-factor test to ascertain whether a person is entitled to wage protection and for compensation for injuries suffered while working, even when the company has denied an employment relationship. See 300 Kan. at 805-28; *Knoble v. National Carriers, Inc.*, 212 Kan. 331, 332-33, 510 P.2d 1274 (1973).

Coates' responsibilities under the 2006 employment agreement arose not from his legal status as an employee, but from the fact that he agreed to those terms by signing the contract. So it is unnecessary to determine whether Coates would have been deemed an employee for other purposes under different legal frameworks.

The language of the 2006 employment agreement demonstrates that the parties to that contract fully recognized that Coates both served as a member of the company and worked in its medical practice. The agreement acknowledged that Coates was "also . . . a

12

Member" of the clinic but nevertheless defined Coates as an "Employee" for its purposes. It set forth licensing requirements and detailed restrictions on Coates' practice not delineated in the earlier operating agreements, including the days and hours to be worked, as well as other clinic and on-call responsibilities. And most important for purposes of this discussion, it included an agreement that Coates would not practice medicine in Neosho, Allen, Woodson, Wilson, Montgomery, and Labette Counties for two years after his work at the clinic. Coates signed the agreement on the line designated "EMPLOYEE."

Coates has never argued that he entered this agreement under duress. Nor has he contested the general enforceability of any aspect of the agreement, including the noncompete clause. Instead, Coates merely asserts that its provisions should not apply to him since he might not be considered an employee in other contexts. But the Kansas Supreme Court has cautioned that courts have a duty "'to sustain the legality of contracts'" when they are "'fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose.'" *Weber v. Tillman*, 259 Kan. 457, 463, 913 P.2d 84 (1996).

The jury found that Coates should be bound by the agreement he signed. There was evidence presented to support this conclusion. Neither the jury nor the district court erred in finding the 2006 employment agreement was valid and enforceable against Coates.

1.2. *Evidence that Labette tortiously interfered with the contract between Coates and Ashley Clinic*

Labette next challenges the jury's finding that it tortiously interfered with the 2006 employment agreement by knowingly inducing and assisting Coates in violating the noncompete clause. On appeal, Labette does not dispute that there was evidence from

which the jury could conclude that it interfered with that agreement. But it argues there was no evidence to show it acted with malice when it did so.

A party claiming tortious interference with a contract must show that the offending party knew of an existing contractual relationship and nevertheless intentionally induced one of the contracting parties to breach that agreement, causing damages to the claimant. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). The Kansas Supreme Court has held that a person intentionally induces a breach when they act maliciously— that is, with "'actual or legal malice.'" *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 426, 77 P.3d 130 (2003). Whether the offending party has acted maliciously is typically a question of fact for the jury. *Smith v. Farha*, 266 Kan. 991, Syl. ¶ 4, 974 P.2d 563 (1999).

The jury found that Labette tortiously interfered with the 2006 employment agreement between Coates and Ashley Clinic when it negotiated with and eventually hired Coates, knowing Coates' position with Labette would violate his noncompete clause. Labette acknowledges these facts but argues they did not demonstrate that it acted maliciously. It claims that malice requires a level of evil-mindedness and an intent to injure—neither of which were present here. Rather, it asserts, the evidence merely showed that Labette acted as any business competitor would—motivated by profits, but not evil intent.

As Ashley Clinic notes in its response brief, Labette's argument conflates *actual malice*, which is required for defamation, with *legal malice*, which is all that must be shown in a claim for tortious interference with a contract or business expectancy. To show legal malice, Ashley Clinic was merely required to present evidence that Labette intended to interfere with the contract without any reasonable justification or excuse. See *Linden Place v. Stanley Bank*, 38 Kan. App. 2d 504, 513, 167 P.3d 374 (2007); see also PIK Civ. 4th 103.05 (legal malice is "the intent to do harm without any reasonable justification or excuse"); PIK Civ. 4th 124.91, Notes on Use ("[L]egal malice, and not

14

actual malice, is still the required element for claims of tortious interference that do not involve defamation, a qualified privilege or other claims or defenses having constitutional underpinnings.").

The jury heard evidence that Labette knew of the noncompete clause in its negotiations with Coates and concluded that he would likely be bound by that provision. It nevertheless hired him for a medical practice less than three miles from Ashley Clinic. In anticipation of his breaching that agreement, Labette included in its contract with Coates a legal allowance to pay $125,000 in legal fees and costs associated with any breach-of-contract action. And it further assessed that hiring Coates would be worth defending its actions, agreeing that Coates would not be required to indemnify Labette should it be sued by Ashley Clinic. The jury could find from this evidence that Labette proceeded with its decision to hire Coates even though it knew its actions would lead to the breach of his contract with Ashley Clinic.

Even so, Labette argues that the jury should have instead found that Labette was justified as a competitor to hire Coates from another medical provider. Labette points to the Restatement (Second) of Torts § 768 (1979), which discusses a privilege for business competitors to interfere with contracts for business purposes as long as they do not employ wrongful means. Though this section has not been adopted in Kansas, our caselaw—reflected in the pattern jury instruction provided to the jury here—recognizes that interference with a contract may be justified in certain instances, including if it occurs for a "legitimate business purpose." See *Burcham*, 276 Kan. at 425.

The Kansas Supreme Court has explained that this justification "'denote[s] the presence of exceptional circumstances which show that no tort has been in fact committed.'" *Turner*, 240 Kan. at 12-13 (quoting 45 Am. Jur. 2d, Interference § 27). Whether such a justification exists turns on several factual questions, including the

15

defendant's motives, the proximity of the defendant's conduct to the interference, and the means employed. See *Burcham*, 276 Kan. at 425.

The jury in this case was instructed on the factors that Kansas courts have found relevant to whether a competitor's interference may be justified. The jury was also informed, consistent with Kansas law, that such a justification may exist when the defendant "used fair means and good faith for some lawful interest or purposes." Accord 276 Kan. at 425 (discussing justification in such circumstances); Restatement (Second) of Torts § 767 (discussing when interference with a contract may be improper). The jury concluded that Labette's conduct—knowingly interfering with Coates' agreement not to compete with Ashley Clinic—was not justified under these facts.

This finding is supported by the evidence and consistent with Kansas law and the Restatement. Indeed, Restatement (Second) of Torts § 768, comment i, illustrates that the very privilege or justification that Labette seeks to benefit from is not intended to apply when a competitor knowingly induces another company's employee to breach a valid covenant not to compete:

> "An employment contract, however, may be only partially terminable at will. Thus it may leave the employment at the employee's option but provide that he is under a continuing obligation not to engage in competition with his former employer. Under these circumstances a defendant engaged in the same business might induce the employee to quit his job, but *he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete*." (Emphasis added.)

In short, the jury's finding that Labette tortiously interfered with the 2006 employment contract between Coates and Ashley Clinic is supported by evidence presented at trial. We will not reweigh that evidence on appeal.

1.3. *Evidence of Ashley Clinic's damages*

In its remaining challenge to the verdict, Labette argues that the evidence presented at trial was not sufficient to support the damages assessed by the jury for its tortious interference. Labette challenges the jury's damage award in two ways. It asserts that the damages awarded by the jury reflected only Ashley Clinic's lost revenue after Coates left the practice and did not reflect the expenses and overhead; in other words, the damages awarded by the jury were based on lost revenue, not lost profits. And it asserts that there was no evidence presented to show that Coates' departure caused the damages the clinic claimed. Again, we are unpersuaded.

Damages need not be established with absolute certainty. *Kendrick v. Manda*, 38 Kan. App. 2d 864, 871, 174 P.3d 432 (2008). Instead, a party claiming that it has been injured as a result of another's wrongful acts must show the extent of its injury—that is, the amount of damages it suffered—with *reasonable* certainty. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 392, 266 P.3d 516 (2011). This requires ""some reasonable basis for computation which will enable the jury to arrive at an approximate estimate"' of the damages." 293 Kan. at 395 (quoting *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 3, 228 P.3d 1048 [2010]).

At trial, Ashley Clinic presented testimony of an accountant it had retained to assess its damages. The accountant compared two 16-month periods—from August 2017 to the end of 2018 (when Coates was still a member of the clinic) and from August 2019 to the end of 2020 (after Coates had left)—to show the difference in income before and after Coates left the practice. The accountant testified that, based on this data, the clinic brought in $739,523.06 less income after Coates departed. The jury eventually awarded this amount as the damages caused by Labette's tortious interference with Coates' agreement with Ashley Clinic.

17

On appeal, Labette acknowledges that the accountant retained by Ashley Clinic testified about the amount of *revenue* the clinic lost in the period after Coates left the practice. But Labette argues that lost revenue, or the difference in the gross income the clinic received, is not an accurate reflection of the clinic's damages. Labette asserts that the correct measure of the clinic's losses is its lost *profit*—the amount left after deducting any changes in expenses from that income.

Ashley Clinic counters that while the distinction between revenue and profit (or between gross revenue and net revenue) might be meaningful in other cases, it is a distinction without a difference here. The clinic notes that its finance director testified at trial that the clinic's expenses and overhead remained the same after Coates left in August 2019. Thus, it asserts, the lost revenue in this case was equal to its lost profit. Accord 22 Am. Jur. 2d, Damages § 57 ("Gross revenue is generally not an appropriate measure of damages because revenue is calculated without regard to the costs the plaintiff incurred in the course of making that revenue. However, when operating expenses or overhead are fixed, gross profits may be awarded as representing net profits.").

Labette argues that the finance director's statement could not have been accurate. It points to other testimony that at least one other employee left Ashley Clinic when Coates did, which should have altered the clinic's overhead. Labette notes that the clinic's witnesses had limited information about the direct costs saved from Coates' departure and were not asked to consider the clinic's variable costs and expenses. And Labette asserts that none of the clinic's witnesses persuasively demonstrated that the clinic's loss in revenue was attributable to Coates' departure, rather than some other factor.

These arguments admittedly have some common-sense appeal. But they go to the strength of the clinic's evidence and the credibility of its witnesses, not to whether there was evidence presented to support the damage award. It was incumbent upon Labette to point out these perceived weaknesses to the jury. Viewing the evidence in the light most

18

favorable to Ashley Clinic, the clinic showed that it lost $739,523.06 in net income following Coates' departure. That evidence was sufficient to show the amount of damages suffered and the cause of those damages. The jury's damage award against Labette was supported by evidence presented at trial.

2. *Ashley Clinic's unjust-enrichment claim*

Turning from the jury verdict to the district court's rulings, Ashley Clinic argues that the court erred when it ruled in Labette's favor on the clinic's unjust-enrichment claim. Ashley Clinic argues that its affiliation with Coates over the course of almost two decades allowed him to develop skills as a surgeon and a name for himself and to establish deep ties to the Chanute community. It asserts that by hiring Coates—who the clinic describes as a "turnkey physician"—Labette inequitably gained the benefit of the clinic's investment.

The district court was unpersuaded by these arguments. It found that Coates' training and reputation were naturally developed during the course of his work at Ashley Clinic, and the clinic always faced the prospect of losing him to a different medical practice. The court stated that the risk of the clinic's patients following Coates to Labette was not a benefit that the clinic conferred upon its competitor, but rather a potential injury to the clinic that was accounted for in its damage claim for Labette's tortious interference with Coates' noncompete agreement.

Claims for unjust enrichment arise in equity. *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 176, 910 P.2d 839 (1996). They seek to enforce contracts implied by law by compensating one party with what should fairly and in good conscience be due from another. 259 Kan. at 176. To succeed on a claim for unjust enrichment, a person must show that they have conferred a benefit upon another party; that the other party knew of or appreciated that benefit; and that the circumstances

19

surrounding the benefit make it inequitable for the other party to retain it without payment for its value. 259 Kan. 166, Syl. ¶ 6.

The district court found that Ashley Clinic had not sustained its burden to prove this claim because the clinic had not shown it conferred any benefit on Labette. We agree. Many benefits that the clinic claims to have bestowed on Labette are merely advancements in Coates' own career development. And while the evidence showed that Labette profited from hiring Coates, that profit was not a benefit provided by Ashley Clinic. If anything, its profits were made as a result of Coates' breach of his noncompete agreement—for which Ashley Clinic had already been compensated by way of its claim that Labette had tortiously interfered with that contract.

It appears that the motivation behind Ashley Clinic's unjust-enrichment claim is not so much its belief that it had conferred a benefit on Labette, but rather its conviction that Labette should not be permitted to profit from its tortious conduct. In other words, Ashley Clinic appears to be asserting that Labette should be forced to disgorge any income that resulted from its wrongful actions. In essence, Ashley Clinic is using its unjust-enrichment claim as an avenue to recover punitive or exemplary damages when, as we discuss later in this opinion, those damages are not available under the KTCA. See K.S.A. 75-6105(c). But a claim for unjust enrichment is not an appropriate vehicle when Ashley Clinic did not bestow a benefit on Labette that required compensation.

The district court did not err when it found that Ashley Clinic had not shown that its actions had unjustly enriched Labette.

3. *Questions regarding the damage awards*

The parties' remaining arguments relate to the appropriateness of the damages awarded against Coates and Labette. Most of these questions center on the applicability

of the KTCA to Labette and the constitutionality and application of the limitations on damages within that Act. Labette and Coates also assert that the damages levied against them are duplicative, as they both derive from the same injury to Ashley Clinic—losses flowing from Coates' breach of the noncompete agreement.

As we explain more fully below, we agree with the district court that the tort claim against Labette is governed by the KTCA, while the contract claims against Coates are not. As such, the district court did not err in applying the Act here—reducing the recoverable damages against Labette to $500,000 and denying Ashley Clinic's claim for punitive damages. We also find that these provisions do not violate the right to a jury trial in section 5 of the Kansas Constitution Bill of Rights because Kansas law did not recognize tort claims against governmental entities at the time our constitution was ratified.

Finally, the district court did not err in entering the respective damage judgments against each defendant because those damages were supported by the evidence at trial. But we agree with Labette and Coates that Ashley Clinic may not recover damages beyond its total claimed losses.

3.1. *The KTCA's limitations on damages and Ashley Clinic's tortious-interference claim against Labette*

The KTCA, K.S.A. 75-6101 et seq., is a comprehensive act adopted in 1979 to define when government actors are immune from civil actions and when they may be held liable for tortious acts. It applies broadly to governmental entities—to state agencies and officials, as well as to counties, townships, cities, school districts, and other municipal actors. K.S.A. 75-6101; K.S.A. 75-6102(a), (b).

The Kansas Supreme Court has described the KTCA as "an 'open ended' act, meaning that liability is the rule and immunity is the exception." *Soto v. City of Bonner Springs*, 291 Kan. 73, 78, 238 P.3d 278 (2010). The Act distinguishes between traditional governmental functions—such as legislative, judicial, and executive enforcement actions—and other circumstances when a governmental entity is carrying out actions that could also be performed by private individuals. See K.S.A. 75-6103; K.S.A. 75-6104(a)(1)-(3). With very few exceptions, the KTCA continues the longstanding rule in this state that governmental entities are absolutely immune from liability for traditional governmental functions (and, though not applicable here, for discretionary acts). See K.S.A. 75-6104. In virtually all other instances, the Act states that a governmental entity is "liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

The extent of this liability is tempered, however, by other provisions of the KTCA. For example, the Act caps the amount of damages for all claims within its scope "arising out of a single occurrence or accident" at $500,000. K.S.A. 75-6105(a). And the Act states that governmental entities and their employees, to the extent they are covered by the Act, are not "liable for punitive or exemplary damages" or for prejudgment interest. K.S.A. 75-6105(c).

Labette is a county hospital organized under the Hospital and Related Facilities Act, K.S.A. 19-4601 et seq. (Hospital Act). Tort claims against county hospitals are generally subject to the KTCA. See K.S.A. 75-6102(b) (county entities are subject to the KTCA); see also K.S.A. 75-6115(a)(2) (KTCA covers claims for professional malpractice against employees of county hospitals). The district court found that Labette is subject to the KTCA and thus reduced the jury's tortious-interference damages from

22

$739,523.06 to $500,000. It also denied Ashley Clinic's request to add a claim for punitive damages.

Ashley Clinic challenges both damages rulings, arguing the KTCA's damages limitations should not apply here. Although the clinic acknowledges that Labette is a county hospital whose actions would ordinarily be covered by the KTCA, it asserts that the Act does not cover Labette's actions in this case because Labette acted beyond its statutory authority by operating a clinic in Neosho County.

The Hospital Act sets forth the circumstances under which a county commission may establish a county hospital. See K.S.A. 19-4603. Once the county has established a hospital, a county commission or hospital board may authorize the construction, purchase, lease, and equipping of an additional hospital or clinic. K.S.A. 19-4606(b). Ashley Clinic asserts that nothing in this provision allowed the Labette County Commission to authorize Labette's medical practice in *Neosho* County where Coates primarily works.

For support, Ashley Clinic points to an opinion of the Kansas Attorney General that analyzed whether a county hospital board may purchase or lease property outside the originating county to run a hospital or clinic. The attorney general opined there that although the Hospital Act did not directly address this question, several provisions of Kansas law, read together, led him to believe that such an action was not permissible. See Att'y Gen. Op. No. 2015-13. But opinions of the attorney general are merely advisory. They are not law and do not bind courts, though we may in some instances find their reasoning persuasive. *Data Tree v. Meek,* 279 Kan. 445, 455, 109 P.3d 1226 (2005).

While this question is interesting in an academic sense, we need not discuss the point further here for two reasons.

23

*First*, as Labette correctly notes in its brief, questions about the extent of a governmental entity's authority are addressed through quo warranto actions. See, e.g., *State, ex rel. Fatzer v. Minneola Hospital District*, 177 Kan. 238, 277 P.2d 607 (1954) (quo warranto action brought by the attorney general to determine the legality of a hospital district); accord *Neiman v. Common School District*, 171 Kan. 237, 246, 232 P.2d 422 (1951) ("If an inquiry is to be made as to whether the school board exceeded its legal authority it should be made in an action by the state on the relation of the attorney general or the county attorney."). Ashley Clinic has not pointed to any statute permitting it to challenge the legality of Labette's authority through its private tort claim.

*Second*, nothing in the KTCA suggests that its damages limitations or other provisions would no longer govern if a governmental entity somehow acted outside its statutory authority. Accord *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 3, 374 P.3d 680 (2016) ("An appellate court merely interprets statutory language as it appears; it is not free to speculate and cannot read into the statute language not readily found there."). Grafting such a restriction into the KTCA would severely limit its effectiveness and complicate its application. For example, would the Act apply if a sheriff's deputy negligently caused an injury just over the county line? What if a state actor misread its authority in other ways? Indeed, aren't governmental actors stepping outside their permitted authority to some extent whenever they engage in tortious conduct? And, on top of that, if we were to accept Ashley Clinic's construction, would the governmental entity lose the benefit of the KTCA entirely, or only in the proportion it exceeds its statutory bounds?

It is not the role of an appellate court to read complications into a statute or to change the scope of legislative policy. Instead, "where the legislature declares a policy, and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for that body and not for the courts." *Spencer Gifts*, 304 Kan. 755, Syl. ¶ 4. In the KTCA, the legislature adopted a comprehensive act defining the

scope of tort liability for virtually all governmental entities. County actors may not exempt themselves from that liability. See K.S.A. 75-6101(c).

In short, we are not persuaded by Ashley Clinic's reading of the KTCA. And we are similarly unconvinced by the clinic's argument that the proprietary nature of Labette's actions changes the application of the Act. The legislature explicitly stated that the Act's tort liability, including the limitations on that liability, was adopted to apply to proprietary acts—"circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

The district court correctly ruled the KTCA and its damages limitations apply to Ashley Clinic's tortious-interference claim against Labette. The court did not err when, consistent with that Act, it reduced the damages for that claim to $500,000 and denied the clinic's claim for punitive damages. See K.S.A. 75-6105(a), (c).

3.2. *The KTCA's damages limitations and the right to a jury trial under section 5 of the Kansas Constitution Bill of Rights*

Ashley Clinic also claims that the two damages limitations under the KTCA that the district court applied in this case—the damage cap of $500,000 and the disallowance of punitive damages—violated the right to a jury trial under the Kansas Constitution. Again, we do not find this argument persuasive.

Section 5 of the Kansas Constitution Bill of Rights states that "[t]he right of trial by jury shall be inviolate." This provision "'preserves the jury trial right as it historically existed at common law when our state's constitution came into existence.'" *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1133, 442 P.3d 509 (2019).

The Kansas Supreme Court has explained that there are "two basic questions in any Section 5 analysis." *State v. Love*, 305 Kan. 716, 735, 387 P.3d 820 (2017).

> "In what types of cases is a party entitled to a jury trial as a matter of right? See, *e.g.*, *Hasty v. Pierpont*, 146 Kan. 517, 72 P.2d 69 (1937) (distinguishing causes at law from causes in equity); see also *City of Fort Scott v. Arbuckle*, 165 Kan. 374, 388-89, 196 P.2d 217 (1948) (distinguishing prosecutions for violation of municipal ordinances and state statutes). And when such a right exists, what does the right protect? See, *e.g.*, *Miller* [*v. Johnson*], 295 Kan. [636,] 647-48, [289 P.3d 1098 (2012)] (analyzing jury's role in determining damages); *Kimball v. Connor*, 3 Kan. 414, 432 (1866) ('[Section 5] . . . does [not] contemplate that every issue, which, by the laws in force at the adoption of the constitution of the State, was triable by jury . . . should remain irrevocably triable by that tribunal.')." *Love*, 305 Kan. at 735.

When assessing whether a law violates section 5 by impermissibly invading the jury's function, courts engage in a two-step analysis. We first must determine whether the law implicates the jury-trial right—for example, by involving a claim that would have been presented to the jury at the time the Kansas Constitution was ratified. If the jury-trial right is implicated, courts must then assess whether the law in question "impairs that right by interfering with the jury's fundamental function." *Hilburn*, 309 Kan. at 1134.

In *Hilburn*, the Kansas Supreme Court found that the cap on noneconomic damages under K.S.A. 60-19a02 violated section 5 of the Kansas Constitution Bill of Rights. 309 Kan. at 1135. A plurality of the court reasoned that the noneconomic damages cap was impermissible because it "intrude[d] upon the jury's determination of the compensation owed personal injury plaintiffs to redress their injuries." 309 Kan. 1127, Syl.

Ashley Clinic asserts that "the exact same criticism" that was noted in *Hilburn* about the noneconomic damage cap in K.S.A. 60-19a02 is present with the KTCA's damage cap in K.S.A. 75-6105(a). We disagree.

Unraveling this issue requires a careful look at history. As Labette points out, *Hilburn* is distinguishable because there, the noneconomic damage statute *limited* the jury's determination on damages that were otherwise available at common law—here, the KTCA *adds* to what was recoverable at common law. 309 Kan. at 1134 ("We have consistently held that the determination of noneconomic damages was a fundamental part of a jury trial at common law and protected by section 5."). For Ashley Clinic's constitutional argument to succeed, there must have been a common-law right to have a jury determine damages against a governmental entity when the Kansas Constitution was ratified. But no such right existed.

Nearly 50 years ago, the Kansas Supreme Court recognized that "governmental immunity was part of the common law at the time the Kansas Constitution was adopted." *Brown v. Wichita State University*, 219 Kan. 2, Syl. ¶ 4, 547 P.2d 1015, *appeal dismissed* 429 U.S. 806 (1976). Originally, this governmental immunity was absolute—immunizing governmental actors for both traditional governmental functions and proprietary actions. It was not until 1969, more than a century after the Kansas Constitution was ratified, that Kansas courts allowed governmental entities to be sued when performing proprietary functions. See *Carroll v. Kittle*, 203 Kan. 841, 849, 457 P.2d 21 (1969). Shortly after the court's decision in *Carroll*, the legislature enacted a comprehensive statutory framework to address the issue of governmental immunity—the predecessor of the KTCA. See *Brown*, 219 Kan. at 6. Then the legislature adopted the KTCA in 1979.

When section 5 was ratified, Kansas law did not permit people to sue government entities. As such, Ashley Clinic would have had no common-law right at that time to sue Labette and have a jury determine damages. The ability to assert that claim arose in 1969 and now only exists in the tort context under the KTCA. That statutory right—including the limitations on damages that define the scope of that right (including the damages cap

and the disallowance of punitive damages)—does not violate the right to trial by jury under section 5 of the Kansas Constitution Bill of Rights.

### 3.3.    *Duplicative damages versus duplicative recovery*

The final questions in this case concern the damages assessed against both Coates and Labette. The defendants argue that the respective damage assessments against each defendant—for $472,913.50 against Coates and for $500,000 against Labette—cannot stand for two reasons: They assert that allowing the two damage assessments to stand violates the KTCA's judgment bar, which prevents judgments against a governmental employer and employee for the same conduct. And they claim that the two damage assessments are duplicative in that they both compensate Ashley Clinic for the same losses and allowing them to stand would grant the clinic a windfall. We address each argument in turn.

Our analysis begins with the KTCA's judgment bar. K.S.A. 75-6107 reads:

> "(a) The judgment in an action subject to the provisions of this act against a governmental entity shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee whose act or omission gave rise to the claim.
> "(b) Any judgment against an employee whose act or omission gave rise to the claim shall constitute a complete bar to any action for injury by the claimant, by reason of the same subject matter, against a governmental entity."

Subsection (a) bars certain actions against an employee when a party recovers against the governmental entity that employs the employee. Subsection (b) does the opposite, barring certain actions against a governmental entity when a person recovers against its employee.

28

Coates and Labette argue that under this statute, Ashley Clinic could only recover against either Coates *or* Labette in the underlying lawsuit. More specifically, because Ashley Clinic recovered against Labette—a governmental entity—on the tortious-interference claim to which the KTCA applied, the Act's judgment bar prohibited entry of judgment against Coates—now Labette's employee—on the contract claims. This argument fails for three significant and related reasons.

*First*, Ashley Clinic's contract claims against Coates are not subject to the KTCA. Kansas courts have long recognized that the Act covers *tort* claims, not contract claims. See *Ritchie Paving, Inc. v. City of Deerfield*, 275 Kan. 631, 643, 67 P.3d 843 (2003) (rejecting that an action based on reasonable detrimental reliance on a promise was barred by the KTCA because it was not based on tort principles); *In re One 1993 Chevrolet Corsica*, 268 Kan. 759, 763, 999 P.2d 927 (2000) ("[T]he Kansas Tort Claims Act is not applicable to the issues herein. There is no claim . . . against the City for negligence or tort."); *Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 695, 751 P.2d 122 (1988) (refusing to entertain arguments about immunity under the KTCA because "while theoretically interesting, are not relevant [because] we are not dealing with a "'tort'"). Thus, the limitations contained in the KTCA do not apply to Ashley Clinic's claim that Coates breached his contracts with the clinic.

*Second*, we disagree with Labette that the damages assessed against each defendant concern "the same subject matter" within the meaning of the KTCA's judgment bar. K.S.A. 75-6107(a), (b). While the defendants' actions were related and often intertwined, they were not the same.

- Coates' liability arose because he breached two contracts with Ashley Clinic—the confidentiality agreement and the 2006 employment agreement. His obligations and liability did not result from a tortious act committed while he was employed at Labette. Instead, they stemmed from a failure to honor his previous, binding

29

agreements. The damages for violating the noncompete clause were not tort damages but liquidated damages defined in his 2006 employment contract.

- Labette's liability arose because it tortiously induced Coates to violate the noncompete agreement, knowing its actions would injure Ashley Clinic. While this conduct is related to Coates' actions, Labette's wrongful acts—including its offer to pay Coates' litigation expenses stemming from his change in employment—differ from Coates' breach of his contract.

*Third*, while Coates is now an employee of Labette, the relationship between the two defendants does not fit comfortably within the scope of K.S.A. 75-6107. That statute prevents a governmental employer from being held liable for the same tortious acts for which its employee has been found liable (or vice versa). In other words, the statute prevents governmental entities and actors—and the taxpayers who fund their positions—from being subject to multiple judgments arising from the same tortious conduct. Not only are Coates' and Labette's actions different here, but Coates was not an employee of Labette at the time most of Labette's tortious conduct occurred. The fact that Coates eventually became employed by Labette does not mean that Ashley Clinic's distinct claims against each defendant merged under the KTCA.

Before turning to Labette's second argument on the appropriateness and collectability of the two damage awards, we note that Ashley Clinic has offered another reason why it believes the KTCA's judgment bar does not apply: It asserts that K.S.A. 75-6107 only bars *subsequent* actions against a governmental entity or its employer, not concurrent claims. We question the clinic's reasoning in that assertion, as K.S.A. 75-6107 only states that a judgment against a governmental employer (or employee) acts as a bar against its employee (or employer) for the same conduct. But because we have concluded that KTCA's judgment bar does not apply for other reasons, we need not discuss this assertion further.

30

In the defendants' final argument, Coates and Labette assert that even if the KTCA's judgment bar does not apply, the damage awards against them are impermissibly duplicative and cannot stand. They argue that Ashley Clinic's damages for both Coates' breach of the 2006 employment agreement and Labette's tortious interference with that contract were the same—the losses suffered from the violation of the noncompete clause. Thus, they argue, the district court should not have entered damage judgments on both of those claims.

Kansas has long adhered to the principle that a plaintiff may present multiple claims of relief to the jury, and judgments on each of those claims—including damage awards—will be upheld on appeal if they are legally sound and supported by the evidence. See *Jacobsen v. Woerner*, 149 Kan. 598, 603, 89 P.2d 24 (1939) (where a plaintiff is injured and several persons are responsible, the injured person has a claim against each tortfeasor). Ashley Clinic presented evidence at trial supporting its claims against each defendant and the damages flowing from those acts.

- The parties recognize that the 2006 employment agreement included a liquidated-damages calculation for Coates' violation of the noncompete agreement and this amount was consistent with the damages the jury found for that breach.

- The jury's damage award against Labette for its tortious interference with Coates' employment agreement was supported by evidence presented at trial. And the KTCA required the district court to reduce the damages against Labette to $500,000.

Thus, we disagree with Coates' and Labette's assertions that the district court erred when it entered damage awards against the defendants for these amounts. We affirm the district court's damage judgments.

We pause before closing to address the parties' related arguments concerning the *recoverability* of these separate damage judgments. In doing so, we recognize that Ashley Clinic has not yet sought satisfaction for the judgments against Labette and Coates. The contrasting assertions in the parties' briefs nevertheless warrant some discussion.

While Kansas law does not prevent the respective damage judgments from being entered against each defendant in this case, it does not follow that Ashley Clinic is automatically entitled to recover the full combined amount of all the damages awarded. Kansas law does not prohibit the district court from *awarding* duplicative damages against separate defendants based on different conduct and different theories of recovery. But Kansas law prohibits a party from *recovering* duplicative damages from separate defendants where the damages arise from the same injury or loss. See *York v. InTrust Bank, N.A.*, 265 Kan. 271, 311-12, 962 P.2d 405 (1998).

Kansas courts have often referred to this principle as the one-satisfaction (or one-recovery) rule. See *Jacobsen*, 149 Kan. at 603. This rule recognizes that a plaintiff may receive "only one recovery for a wrong." *York*, 265 Kan. at 311.

While the nature of tort claims and contract claims differ, the general aim of compensatory damages in tort and of damages in contract is the same—to make the injured party whole. See *Burnette v. Eubanks*, 308 Kan. 838, 857, 425 P.3d 343 (2018) (compensatory damages for an injury caused by a tort are meant to restore the plaintiff to a pre-injury position); *Peterson v. Ferrell*, 302 Kan. 99, 106, 349 P.3d 1269 (2015) (contract damages aim "to put the nonbreaching party in the position he or she would have been in had the breach never occurred"). When damage awards are entered against multiple parties for the same injury, a plaintiff is not entitled to a windfall. Rather, they can only recover up to the amount of compensatory or contract damages that would make them whole. *York*, 265 Kan. at 312.

Ashley Clinic's witnesses testified at trial that the clinic had suffered $739,523.06 in losses as a result of Labette's tortious interference with the 2006 employment contract. Although the damage award against Coates for breach of that agreement was determined by a liquidated-damages provision, not based on the witnesses' testimony, that award sought to compensate the clinic for the same injury—losses arising from Coates' breach of the agreement's noncompete clause. Accord *Horizon Memorial Group, L.L.C. v. Bailey*, 280 S.W.3d 657, 667 (Mo. Ct. App. 2009) (finding damage awards for a tortious-interference claim and for breach of contract based on a liquid-damages provision were "coextensive because they arose from Bailey's breach of contract and were awarded solely to compensate Horizon and Bailey & Cox for the lost benefits of their contract"). The damages from Coates' breach of the confidentiality agreement ($9,437.50) were a separate and independent loss.

While it is true that the damage judgments against Coates and Labette were each based on the evidence presented at trial, the one-satisfaction rule dictates that Ashley Clinic may only *recover* combined damages from the defendants up to its total claimed loss. Thus, while Ashley Clinic may seek to recover damages from each defendant up to each respective judgment, the clinic may not recover more than $739,523.06 combined from the tortious-interference claim and Coates' breach of the 2006 employment agreement. Any issue that may arise in applying the one-satisfaction rule to Ashley Clinic's separate judgments against Labette and Coates must be addressed and resolved by the district court in a post-judgment proceeding.

CONCLUSIONS

There was evidence at trial to support the reliance on the 2006 employment agreement between Coates and Ashley Clinic as a valid and enforceable contract. The jury's finding that Labette tortiously induced Coates to breach that agreement, causing $739,523.06 in damages, was also supported by the evidence presented.

33

The district court did not err when it ruled in Labette's favor on Ashley Clinic's unjust-enrichment claim, as the clinic had not demonstrated that it conferred any benefit on Labette that warranted further compensation.

Labette is a county hospital, and the scope of any tort claim against Labette is defined by the KTCA. Consistent with the KTCA, the district court properly reduced Ashley Clinic's damages claim against Labette to $500,000 and properly denied the clinic's claim for punitive damages. See K.S.A. 75-6105(a), (c).

The KTCA's limitations on damages, including the Act's cap on total damages and its bar against punitive damages, do not violate the right to a jury trial in section 5 of the Kansas Constitution Bill of Rights.

The KTCA's judgment bar in K.S.A. 75-6107 does not prevent damage awards from being entered against both Coates and Labette.

The district court did not err when it entered the respective damage judgments against Coates and Labette, as those damages were supported by evidence at trial. But Ashley Clinic may not recover more than its total claimed damages at trial when it seeks to satisfy those judgments.

Affirmed.